**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Chester FULLER and Maxine Fuller
(939.62 acres of land, more or less, situated in Yuma and Mohave Counties,
State of Arizona), Defendants-Appellees.**

**No. 23932.**

United States Court of Appeals,
Ninth Circuit.

April 29, 1971.

Rehearing Denied June 23, 1971.

Edmund B. Clark (argued), Dept. of Justice, Washington, D. C., Richard Burke, U. S. Atty., Richard S. Alleman, Asst. U. S. Atty., Shiro Kashiwa, Asst. Atty. Gen., Phoenix, Ariz., for plaintiff-appellant.

Frank Burch (argued), of Kramer, Roche, Burch, Streich & Cracchiolo, Phoenix, Ariz., for defendants-appellees.

Before ELY, WRIGHT and KILKENNY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This is an appeal in a condemnation action from judgment entered on a jury verdict fixing $350,000 as just compensation for the taking of two tracts totalling 920 acres. This court has jurisdiction under 28 U.S.C. § 1291. On appeal by the United States, we affirm.

The land taken was used by the landowners, Mr. and Mrs. Fuller, as part of a 44,768-acre ranch operation composed of:

| | |
|---|---|
| fee land | 1,280 acres |
| state leased land | 12,027 acres |
| federal domain leased under the Taylor Grazing Act (43 U.S.C. § 315b) | 31,461 acres |
| TOTAL | 44,768 acres |

In 1967 the United States instituted a proceeding in eminent domain to acquire title to two parcels of the Fullers' fee land, totaling 920 acres. At no time prior to or during the pendency of the condemnation action were the Fullers' exclusive, revocable grazing permits on the public lands revoked, nor were such lands included in the condemnation action.

It was the government's theory that in determining the fair market value of the base fee lands taken, no consideration should be given to the use to which such lands might be put in conjunction with adjacent public domain lands covered by federal grazing permits. Fuller contended, on the other hand, that since the highest and best use of his fee lands (together with state and federal leased lands) was that of a cattle ranch, the use of the leased federal public domain lands should be considered in determining the fair market value of his fee lands.

Fuller was engaged in a large-scale cattle operation known as a year-round "cow-calf" ranch, made possible because the fee lands were situated at the confluence of two rivers. Cheap water was available, and the fee lands had been cleared, cultivated and irrigated. They were planted to alfalfa and other grasses and Fuller did not have to rely on the condition of the grazing land and could graze his cattle the year round.

It was a stable and profitable operation. Without the fee lands, the only practical use would be raising steers, which would be purchased annually, fattened until the desert feed dried up and then sold.

The district court instructed the jury as follows:

" * * * [R]eference has been made to grazing permits held by the defendants on public land. You are instructed that such permits are mere licenses which may be revoked and are not compensable as such. However, if you should determine that the highest and best use of the property taken is a use in conjunction with those permit lands, you may take those permits into consideration in arriving at your value of the subject land, keeping in mind the possibility that they may be withdrawn or cancelled at any time without a constitutional obligation to pay the compensation therefor. * * * In fixing the fair market value of the fee land being taken and the compensation to be awarded, you are not to award defendants any compensation for the land owned by the United States or the State of Arizona."

Government witnesses fixed the value of the condemned land at $135,000. The valuation testimony of the landowners fixed it at $682,000 to $985,000. The jury awarded $350,000.

The trial court's instruction to the jury was in accord with the rule of United States v. Jaramillo, 190 F.2d 300 (10th Cir. 1951). In a factual situation almost identical to the case before us, the Court of Appeals for the 10th Circuit said:

"In the judicial determination of fair value as just compensation for the land taken, the highest and most profitable use for which it is reasonably adaptable may be considered, 'not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the

market value while the property is privately held,' (Citations omitted.) All rights, easements and privileges appurtenant thereto should be considered in estimating its fair value or compensation to be paid, taking into account also the possibility of their being discontinued without resulting obligation." *Jaramillo* at p. 302.

Recognizing that *Jaramillo* is in point, the government submits that the rule of that case is wrong and inconsistent with that of United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). *Rands* was a navigational servitude case. There the Court held that the compensable value of private riparian fast lands taken by the government did not include its special value as a port site since the owner had no right of access to the navigable waters which could be legally protected as against the United States.

A careful examination of the rationale of the navigational servitude cases and the federal legislation regarding grazing permits gives rise to a basis for distinguishing the cases relied upon by the government. In *Rands,* it was said:

"The Commerce Clause confers a unique position upon the Government in connection with navigable waters. 'The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States * * *. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.' Gilman v. Philadelphia, 3 Wall. 713, 724–725 [18 L.Ed. 96] (1866). This power to regulate navigation confers upon the United States a 'dominant servitude,' FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 686] (1954), which extends to the entire stream and the stream bed below ordinary highwater mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. * * * Thus, without being constitutionally obligated to pay compensation, the United States may change the course of a navigable stream, * * * or otherwise impair or destroy a riparian owner's access to navigable waters, * * * even though the market value of the riparian owner's land is substantially diminished." United States v. Rands, 389 U.S. at 122–123, 88 S.Ct. at 266.

Similarly, in United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), the dominant navigational servitude was held to entitle the government to condemn land without considering its special value as a hydroelectric site.

The government is correct in its assertion that the constitutional provision and subsequent court interpretation authorized Congress to regulate navigable streams to the total exclusion of private rights. United States v. Rands, 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329. However, when Congress legislates in a manner that recognizes special rights or privileges in navigable waters, then the government is required to compensate for the destruction of such rights, notwithstanding the fact that Congress had the constitutional power to exclude private rights completely. United States v. Twin City Power Co., *supra*, 350 U.S. at 225, 76 S.Ct. 259.

A study of the Taylor Grazing Act leads to the conclusion that Congress exercised less than its constitutional power over public lands and recognized special rights against third parties and sometimes the government itself. Unlike navigational servitude, there are some private rights and privileges bestowed and protected by the Act which justify the conclusion that the uses to which federal grazing lands are dedicated are unlike the undiminished public uses of navigable streams.

For example, the Act creates section 3 lands and section 15 lands. The latter are disconnected, non-contiguous tracts which are not contained in grazing districts. Section 3 lands, involved here, are located within grazing districts and are administered by the Secretary of the Interior through a system of preferential grazing permits. These run as long as ten years and permit holders have a preferential right to renewal. 43 U.S.C. § 315b.

Though the Act does not create any interest in the lands themselves, it does require that "grazing privileges recognized and acknowledged shall be adequatly safeguarded" by the government. 43 U.S.C. § 315b. *See* Red Canyon Sheep Co. v. Ickes, 69 App.D.C. 27, 98 F.2d 308, 314 (1938).

While grazing permits are unrevoked, neither the grantor nor third party may interfere with their exercise. In fact, the government has an affirmative obligation to safeguard them adequately. Oman v. United States, 179 F.2d 738 (10th Cir. 1949).

"Other courts have held that these permits conferred rights subject to judicial protection. In Arizona, the holder of similar grazing permits was said to be entitled to an action of trespass against encroaching ranchers. Garcia v. Sumrall, 58 Ariz. 526, 121 P.2d 640. Even the opinion in the *Osborne* case, *supra* [Osborne v. United States, 9 Cir., 145 F.2d 892], implied that these permits would be 'highly valuable as between private persons'. * * * In the Red Canyon Sheep Co. case [69 App.D.C. 27] 98 F.2d 308, it was held that, whatever the rights accruing under the permits be denominated, they were entitled to equitable protection." *Oman* at p. 742.

In McNeil v. Seaton, 108 U.S.App.D.C. 296, 281 F.2d 931, 934 (1960), the court held that a new grazing district rule could not be applied to one who had obtained his permit during the first priority period established by the Act. In so holding, the court said that while the

permits exist, "they are something of real value * * * which have their source in an enactment of the Congress." The court concluded by saying that the permit holders can be protected against wrongful interference by the United States with the statutory rights or privileges represented by the permits.

Thus it can be seen that the government's control over Taylor Grazing Act lands is not the same as the absolute control enjoyed under the navigational servitude.

There is another basis for distinguishing the navigational servitude cases represented by *Rands* and *Twin City*. In those cases the issue was whether the government should pay additional compensation for the theoretical value of potential uses, *i. e.*, port sites and hydroelectric operation. Actual investments had not occurred. There was no congressional policy of use and development of navigable waters as a part of private commercial enterprises.

In situations where the government has requested private investment to help develop and utilize navigable waters, then the government has had to pay the "going concern" value upon condemnation. Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893). In *Monongahela* the government had to pay both for locks and a dam built at the government's invitation.

The purpose of the Taylor Grazing Act was to develop and stabilize the western cattle business. By providing for regulated use and protection of grazing rights, the government helped to improve the use of the land as did the changes which effected public use of the river in *Monongahela*. The difference between our case and that is one of degree.

It was, therefore, not improper for the trial court to allow the jury to consider the conjunctive use of the fee and permit lands, so long as the jury was admonished to consider the possibility that the permits might be withdrawn at any time without compensation.

The government's remaining arguments are without merit. Some rely on cases which are distinguishable because the permits were cancelled and the holders of the permits were seeking compensation.[1] Other contentions are answered by *Jaramillo*, with which decision we are in accord.

Affirmed.

KILKENNY, Circuit Judge (dissenting):

I believe that United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), controls on the federal lands and that the judgment of the lower court should be reversed.

Tuttle, Circuit Judge, filed a dissenting opinion.

See also, 5 Cir., 413 F.2d 793.

1. Osborne v. United States, 145 F.2d 892 (9th Cir. 1944). Acton v. United States, 401 F.2d 896 (9th Cir. 1968), cert. den. Clifton v. United States, 393 U.S. 1121, 89 S.Ct. 1003, 22 L.Ed.2d 128 and 395 U.S. 945, 89 S.Ct. 2018, 23 L.Ed.2d 463. Mollohan v. Gray, 413 F.2d 349 (9th Cir. 1969).