## UNITED STATES *v.* FULLER ET UX.

No. 71–559.  Argued October 18, 1972—Decided January 16, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and BLACKMUN, JJ., joined. POWELL, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined, *post*, p. 494.

*Harry R. Sachse* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Frizzell, Raymond N. Zagone,* and *Jacques B. Gelin.*

*Frank Haze Burch* argued the cause for respondents. With him on the brief was *Daniel Cracchiolo.*

*Francis Gallagher* filed a brief for the Montana Public Lands Council as *amicus curiae* urging affirmance.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents operated a large-scale "cow-calf" ranch near the confluence of the Big Sandy and Bill Williams Rivers in western Arizona.  Their activities were conducted on lands consisting of 1,280 acres that they

owned in fee simple (fee lands), 12,027 acres leased from the State of Arizona, and 31,461 acres of federal domain held under Taylor Grazing Act permits issued in accordance with § 3 of the Act, 48 Stat. 1270, as amended, 43 U. S. C. § 315b. The Taylor Grazing Act authorizes the Secretary of the Interior to issue permits to livestock owners for grazing their stock on Federal Government lands. These permits are revocable by the Government. The Act provides, moreover, that its provisions "shall not create any right, title, interest, or estate in or to the lands." *Ibid.*

The United States, petitioner here, condemned 920 acres of respondents' fee lands. At the trial in the District Court for the purpose of fixing just compensation for the lands taken, the parties disagreed as to whether the jury might consider value accruing to the fee lands as a result of their actual or potential use in combination with the Taylor Grazing Act "permit" lands. The Government contended that such element of incremental value to the fee lands could neither be taken into consideration by the appraisers who testified for the parties nor considered by the jury. Respondents conceded that their permit lands could not themselves be assigned any value in view of the quoted provisions of the Taylor Grazing Act. They contended, however, that if on the open market the value of their fee lands was enhanced because of their actual or potential use in conjunction with permit lands, that element of value of the fee lands could be testified to by appraisers and considered by the jury. The District Court substantially adopted respondents' position, first in a pretrial order and then in its charge to the jury over appropriate objection by the Government.

On the Government's appeal, the Court of Appeals for the Ninth Circuit affirmed the judgment and approved the charge of the District Court. 442 F. 2d 504.

That court followed the earlier case of *United States* v. *Jaramillo,* 190 F. 2d 300 (CA10 1951), and distinguished our holding in *United States* v. *Rands,* 389 U. S. 121 (1967). The dissenting judge in the Ninth Circuit thought the issue controlled by *Rands, supra.* We granted certiorari. 404 U. S. 1037 (1972).

Our prior decisions have variously defined the "just compensation" that the Fifth Amendment requires to be made when the Government exercises its power of eminent domain. The owner is entitled to fair market value, *United States* v. *Miller,* 317 U. S. 369, 374 (1943), but that term is "not an absolute standard nor an exclusive method of valuation." *United States* v. *Virginia Electric & Power Co.,* 365 U. S. 624, 633 (1961). The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, *United States* v. *Commodities Trading Corp.,* 339 U. S. 121, 124 (1950), as its does from technical concepts of property law.

The record shows that several appraiser witnesses for respondents testified that they included as an element of the value that they ascribed to respondents' fee lands the availability of respondents' Taylor Grazing Act permit lands to be used in conjunction with the fee lands. Under the District Court's charge to the jury, the jury was entitled to consider this element of value testified to by the appraisers. This Court has held that generally the highest and best use of a parcel may be found to be a use in conjunction with other parcels, and that any increment of value resulting from such combination may be taken into consideration in valuing the parcel taken. *Olson* v. *United States,* 292 U. S. 246, 256 (1934). The question presented by this case is whether there is an exception to that general rule where the parcels to be aggregated with the land taken are themselves owned

by the condemnor and used by the condemnee only under revocable permit from the condemnor.

To say that this element of value would be considered by a potential buyer on the open market, and is therefore a component of "fair market value," is not the end of the inquiry. In *United States* v. *Miller, supra,* this Court held that the increment of fair market value represented by knowledge of the Government's plan to construct the project for which the land was taken was not included within the constitutional definition of "just compensation." The Court there said:

> "But [respondents]insist that no element which goes to make up value . . . is to be discarded or eliminated. We think the proposition is too broadly stated. . . ." 317 U. S., at 374.

*United States* v. *Cors,* 337 U. S. 325 (1949), held that the just compensation required to be paid to the owner of a tug requisitioned by the Government in October 1942, during the Second World War, could not include the appreciation in market value for tugs created by the Government's own increased wartime need for such vessels. The Court said: "That is a value which the government itself created and hence in fairness should not be required to. pay." *Id.,* at 334. A long line of cases decided by this Court dealing with the Government's navigational servitude with respect to navigable waters evidences a continuing refusal to include, as an element of value in compensating for fast lands that are taken, any benefits conferred by access to such benefits as a potential portsite or a potential hydro-electric site. *United States* v. *Rands, supra; United States* v. *Twin City Power Co.,* 350 U. S. 222 (1956); *United States* v. *Commodore Park,* 324 U. S. 386 (1945).

These cases go far toward establishing the general principle that the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain. If, as in *Rands,* the Government need not pay for value that it could have acquired by exercise of a servitude arising under the commerce power, it would seem *a fortiori* that it need not compensate for value that it could remove by revocation of a permit for the use of lands that it owned outright.

We do not suggest that such a general principle can be pushed to its ultimate logical conclusion. In *United States* v. *Miller, supra,* the Court held that "just compensation" did include the increment of value resulting from the completed project to neighboring lands originally outside the project limits, but later brought within them. Nor may the United States "be excused from paying just compensation measured by the value of the property at the time of the taking" because the State in which the property is located might, through the exercise of its lease power, have diminished that value without paying compensation. *United States ex rel. TVA* v. *Powelson,* 319 U. S. 266, 284 (1943).

"Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings." *United States* v. *Miller, supra,* at 375. Seeking as best we may to extrapolate from these prior decisions such a "working rule," we believe that there is a significant difference between the value added to property by a completed public works project, for which the Government must pay, and the value added to fee lands by a revocable permit authorizing the use of neighboring lands that the Government owns. The Government

may not demand that a jury be arbitrarily precluded from considering as an element of value the proximity of a parcel to a post office building, simply because the Government at one time built the post office. But here respondents rely on no mere proximity to a public building or to public lands dedicated to, and open to, the public at large. Their theory of valuation aggregates their parcel with land owned by the Government to form a privately controlled unit from which the public would be excluded. If, as we held in *Rands,* a person may not do this with respect to property interests subject to the Government's navigational servitude, he surely may not do it with respect to property owned outright by the Government. The Court's statement in *Rands* respecting portsite value is precisely applicable to respondents' contention here that they may aggregate their fee lands with permit lands owned by the Government for valuation purposes:

> "[I]f the owner of the fast lands can demand port site value as part of his compensation, 'he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. . . . To require the United States to pay for this . . . value would be to create private claims in the public domain.'" 389 U. S., at 125, quoting *United States* v. *Twin City Power Co.,* 350 U. S., at 228.

We hold that the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents' fee lands in combination with the Government's permit lands.

The Court of Appeals based its holding in part on its conclusion that although the Fifth Amendment might not have required the Government to pay compensation

of the sort permitted by the trial court's charge to the jury, the history of the Taylor Grazing Act indicated that Congress had intended that such compensation be paid. Congress may, of course, provide in connection with condemnation proceedings that particular elements of value or particular rights be paid for even though in the absence of such provision the Constitution would not require payment. *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725 (1950). But we do think the factors relied upon by the Court of Appeals fall far short of the direction contained in the Reclamation Act of 1902, 32 Stat. 388, as amended, that payment be made for rights recognized under state law, which was determinative of the outcome in *Gerlach.* The provisions of the Taylor Grazing Act quoted *supra* make clear the congressional intent that no compensable property right be created in the permit lands themselves as a result of the issuance of the permit. Given that intent, it would be unusual, we think, for Congress to have turned around and authorized compensation for the value added to fee lands by their potential use in connection with permit lands. We find no such authorization in the applicable congressional enactments.

*Reversed.*

MR. JUSTICE POWELL, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, dissenting.

I dissent from a decision which, in my view, dilutes the meaning of the just compensation required by the Fifth Amendment when property is condemned by the Government. As a full understanding of the facts is necessary, I will begin by restating them.

This is a condemnation proceeding brought by the United States to acquire title to 920 of 1,280 acres of land, owned in fee by respondents, which is within the area to

be flooded by a dam and reservoir project in Arizona. At the time of the taking respondents used this fee land as a base for a cattle operation known as a "cow-calf" ranch. A dependable source of water allowed intense cultivation of the fee land to provide the basic source of feed for the cattle. In connection with their fee land, respondents used 31,461 acres of adjacent public land on which they held revocable grazing permits issued under the Taylor Grazing Act. 43 U. S. C. § 315 *et seq.*[1] The public land was used for grazing during favorable seasons, and roads running across the public land connected respondents' three parcels of fee land.

The permits held by respondents on the public land accorded exclusive but revocable grazing rights to respondents. By the terms of the Act, the issuance of a permit does not "create any right, title, interest, or estate in or to the lands." 43 U. S. C. § 315b. Nonetheless, grazing permits are of considerable value to ranchers and serve a corresponding public interest in assuring the "most beneficial use" of range lands. *Hatahley* v. *United States,* 351 U. S. 173, 177 (1956). Respondents' permits had not been revoked at the time of the taking, nor, so far as the record reveals, have they yet been revoked. The record also shows that only a small fraction of the public grazing land will be flooded in the dam and reservoir project. Thus, the public land which respondents assert gave added value to their fee land remains substantially intact and available for Taylor Grazing Act purposes.

The District Court allowed respondents to introduce testimony as to the market value of the fee land which took into consideration its proximity to this public

---

[1] In addition, respondents grazed their cattle on 12,027 acres of land leased from the State, but this land is not relevant to the controversy now before us.

land. In relevant part, the District Court instructed the jury as follows:

"During the course of this trial, reference has been made to grazing permits held by the defendants on public land. You are instructed that such permits are mere licenses which may be revoked and are not compensable as such. However, should you determine that the highest and best use of the property taken is a use in conjunction with those permit lands, you may take those permits into consideration in arriving at your value of the subject land, keeping in mind the possibility that they may be withdrawn or canceled at any time without a constitutional obligation to pay the compensation therefor.

"Evidence has been introduced of defendants' use of their deeded land which is being taken, in conjunction with surrounding land owned by the United States, for which defendants have grazing permits, and land belonging to the State of Arizona, which defendants leased. In fixing the fair market value of the fee land being taken and the compensation to be awarded, you are not to award defendants any compensation for the land owned by the United States or the State of Arizona. However, in determining the value of the fee land and in awarding compensation to the owners, you should consider the availability and accessibility of the permit and leased land and its use in conjunction with the fee land taken and give to the fee land such value as, in your judgment, according to the evidence, should be given on account of such availability and accessibility of the permit and leased land, if any. You should also consider the possibility that the permits on the United States land could be withdrawn at any time without constitutional obligation to pay compensation therefor and determine the effect you

feel such possibility, according to the evidence, would have upon the value of the fee land." App. 26–27.

I have reproduced this extensive excerpt to underline the careful manner in which the condemnation jury was instructed. Contrary to the implication in the Government's framing of the question in this case,[2] the jury was not allowed to include "the value of revocable grazing permits." The instruction expressly stated that "such permits are mere licenses which may be revoked and are not compensable as such." The emphasis of the instruction was on the location of the fee land, with the resulting "availability and accessibility" of the adjacent public grazing land. I find the instruction to be an appropriate statement of the applicable principles of just compensation.

The opinion of the Court recognizes that the just compensation required by the Fifth Amendment when the Government exercises its power of eminent domain is ordinarily the market value of the property taken. *United States* v. *Miller,* 317 U. S. 369, 374 (1943). It is commonplace, in determining market value—whether

---

[2] As stated by the Government, the question presented by this case is:

"Whether the owner of land taken by the United States is entitled to have included in the measure of his compensation the value of revocable grazing permits on adjoining federal land issued under an Act of Congress which specifies that such grazing permits create no 'right, title, interest, or estate in or to the lands.'" Brief for United States 2.

More accurate, in light of the District Court's instruction, is respondents' statement of the question:

"Whether, in determining the compensation due an owner of land taken by the United States, the jury may consider the availability and accessibility of public lands, so long as consideration is also given the possibility that the grazing permits on the public land may be withdrawn." Brief for Respondents 1–2.

in condemnation or in private transactions—to consider such elements of value as derive from the *location* of the land. But today the Court enunciates an exception to these recognized principles where the value of the land to be condemned may be enhanced by its location in relation to Government-owned property. The Court relies on two lines of cases which, indeed, are said to go far toward establishing

> "the general principle that the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain." *Ante,* at 492.

Applying this new principle to the present case, the Court now holds that since the Government "created" an element of value by owning grazing land and making it available under the Taylor Grazing Act, and since it has the power to "destroy" this element of value by barring respondents and others from the land, the condemnation jury must ignore the fact that respondents' land is adjacent to public land. Under this formulation, it is quite immaterial that the grazing land remains substantially intact, and that the Government has taken no action— and none is shown to be contemplated in the record— to convert such land to some other use. The test is not whether the Government has in fact put its property to some other use or removed it entirely; rather, it is quite simply whether the Government has the power to do this.

Neither of the lines of cases on which the Court relies seems apposite. The first includes *United States* v. *Miller, supra,* in which the Court held that the Government need not pay for an increase in value occa-

sioned by the very project for which the land was condemned, and *United States* v. *Cors,* 337 U. S. 325 (1949), in which the Court held that in condemning tugboats during wartime the Government need not offer compensation for an increase in value attributable to its own extraordinary wartime demand for such craft. These cases support only the modest generalization that compensation need not be afforded for an increase in market value stemming from the very Government undertaking which led to the condemnation.

The other cases on which the Court relies, *United States* v. *Rands,* 389 U. S. 121 (1967), and *United States* v. *Twin City Power Co.,* 350 U. S. 222 (1956), deal with the condemnation of lands adjacent to navigable waters. In *Rands,* the condemnee owned land on the Columbia River which the United States condemned "in connection with the John Day Lock and Dam Project, authorized by Congress as part of a comprehensive plan for the development of the Columbia River." 389 U. S., at 122. Relying on the "unique position" of the Government "in connection with navigable waters," *ibid.,* the Court held that no special element of value could be accorded the land by virtue of its possible use as a port. In *Twin City,* the condemnee was holding land on the Savannah River as a potential hydroelectric powersite. The Government condemned the land as part of a major flood control, navigation, and hydroelectric project. By a bare majority vote, the Court held that the condemnee was not entitled to the "special water-rights value" of the land as a potential powersite, distinguishing other cases with the comment:

> "We have a different situation here, one where the United States displaces all competing interests and appropriates the entire flow of the river . . . ." 350 U. S., at 225.

The water rights cases may be subject to varying interpretations, but it is important to remember when interpreting them that they cut sharply against the grain of the fundamental notion of just compensation, that a person from whom the Government takes land is entitled to the market value, including location value, of the land. They could well be confined to cases involving the Government's "unique position" with respect to "navigable waters."[3] At most, these cases establish a principle no broader than that the Government need not compensate for location value attributable to the proximity of Government property utilized in the same project. In *Rands,* as in *Twin City,* the river adjacent to the property condemned was the focal point of the development project which led to the condemnation. The Government simply decided to put the river to a new use and in connection with that new use condemned adjacent land.

To understand why compensation is not required in such cases, it is important to distinguish the Government's role as condemnor from its role as property owner. While as condemnor the Government must pay market value, as property owner it may change the use of its property as if it were a private party, without paying compensation for the loss in value suffered by neighboring land.

---

[3] Arguably, then, these are water rights cases and nothing more. Suitable sites for hydroelectric plants or port facilities are important natural resources, highly valuable but limited in number, over which the Government has peculiar historical and constitutional sway. On this view, while the Government has equal authority over Taylor Grazing Act land and other Government-owned property, proximity to such property may appropriately be treated differently from proximity to navigable water for the purpose of measuring just compensation. This was one of the bases on which the court below distinguished the water cases from the present case, 442 F. 2d 504, 507 (CA9 1971), and in my view is an alternative ground for affirming the judgment below.

When the Government condemns adjoining parcels of privately owned land for the same project, it may not take advantage of a drop in market value of one parcel resulting from the decision to condemn another. When, however, as in *Rands* and *Twin City*, a project encompasses not only parcels of private land, but also the public property which enhances the value of the private land, a more difficult question is presented. In each of those cases, the Government held a dominant servitude over the flow of a river, and it condemned adjacent private lands in connection with a decision to exercise its servitude. Arguably, the measure of compensation for the taking of the private lands should have included the value of the riparian location unaffected by the Government's decision to exercise its own rights in the river. But this result would have impinged on the Government's right to use the river by raising the cost of any new use which required the condemnation of private land.

Accordingly, in those cases the Court excluded evidence of riparian location value since the Government was exercising its lawful power to appropriate "the entire flow of the river."

> "The proper exercise of this power [over navigable waters] is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject." *United States* v. *Rands,* 389 U. S., at 123.

In any event, the present case is quite different. Respondents' lands were condemned not because the Government as property owner decided to put its grazing land to some other use and needed additional land, but

rather because the Government wanted respondents' land for a project which left the grazing land substantially intact and available.[4]

The Government's role here is not an ambiguous one—it is simply a condemnor of private land which happens to adjoin public land. If the Government need not pay location value in this case, what are the limits upon the principle today announced? Will the Government be relieved from paying location value whenever it condemns private property adjacent to or favorably located with respect to Government property?[5] Does the principle apply, for example, to the taking of a gasoline station at an interchange of a federal highway, or to the taking of a farm which in private hands could continue to be irrigated with water from a federal reservoir? The majority proposes to distinguish such cases with the "working rule" that

> "there is a significant difference between the value added to property by a completed public works project, for which the Government must pay, and the value added to fee lands by a revocable permit

---

[4] In two cases decided together involving the condemnation of ranch land used in connection with Taylor Grazing Act land, a panel of the Court of Appeals for the Tenth Circuit followed a similar analysis in awarding location value in one case, *United States* v. *Jaramillo*, 190 F. 2d 300 (1951), but not in the other, *United States* v. *Cox*, 190 F. 2d 293 (1951). In *Jaramillo*, the court stated: "By appropriate condemnation proceedings . . . the Government took appellee's fee and leased land as a part of a total of 20,061 acres, to be used for war purposes. But, *unlike the Cox and Beasley cases, the project did not contemplate the acquisition of the forest land covered by appellee's permit.*" (Emphasis added.) *Id.,* at 301.

[5] If so, the contrast between condemnation proceedings and other transactions would be stark: the enhancement of value stemming from public highways, parks, buildings, and recreational facilities is commonly recognized for purposes of taxation, mortgaging, and private sales.

authorizing the use of neighboring lands which the Government owns." *Ante,* at 492.

The Court can hardly be drawing a distinction between Government-owned "completed public works" and Government-owned parks and grazing lands in their natural state. The "working rule" as articulated can, therefore, only mean that the respondents' revocable permit to use the neighboring lands is regarded by the Court as the distinguishing element. This is an acceptance of the Government's argument that the added value derives from the permit and not from the favorable location with respect to the grazing land.[6] The answer to this, not addressed either by the Government or the Court, is that the favorable location is the central fact. Even if no permit had been issued to these respondents, their three tracts of land—largely surrounded by the grazing land—were strategically located and logical beneficiaries of the Taylor Grazing Act. In determining the market value of respondents' land, surely this location—whether or not a permit had been issued [7]—would enter into any rational estimate of value. This is precisely the rationale of the District Court's jury instruction, which carefully distinguished between the revocable permits "not compensable as such" and the "availability and accessibility" of the grazing land. It is this distinction which the Court's opinion simply ignores.

Finally, I do not think the Court's deviation from the market-value rule can be justified by invocation of long-

---

[6] See n. 2, *supra.*

[7] Even if, as the Government's argument suggests is possible, the permits held by respondents had been withdrawn as a prelude to this condemnation, the Taylor Grazing Act contemplates their issuance in the public interest and the record discloses no other private landowners as favorably located to qualify for permits as these respondents.

established "basic equitable principles of fairness." *Ante,* at 490. It hardly serves the principles of fairness as they have been understood in the law of just compensation to disregard what respondents could have obtained for their land on the open market in favor of its value artificially denuded of its surroundings.[8]

I would affirm the judgment of the Court of Appeals.

---

[8] Respondents' witnesses valued the land at figures up to nearly a million dollars, while the Government's expert witness assigned it a value of $136,500. In what was manifestly a compromise, the jury awarded $350,000.