UNITED STATES of America, Plaintiff,

v.

**40,021.64 ACRES OF LAND, MORE OR LESS, situate IN DONA ANA ET AL., COUNTIES, STATE OF NEW MEXICO, and Genevieve Moore, et al., Defendants.**

Civ. No. 8527.

United States District Court,
D. New Mexico.

Jan. 10, 1975.

---

Victor R. Ortega, U. S. Atty., James B. Grant, Asst. U. S. Atty., Albuquerque, N. M., Max E. Findley, Don Strouse, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

William O. Jordan, Sp. Asst. Atty. Gen., Santa Fe, N. M., for the State of New Mexico.

Hinkle, Bondurant, Cox & Eaton, Roswell, N. M., Otto & Schauer, William C. Schauer, Shipley, Durrett, Conway & Sandenaw, Alamogordo, N. M., for William G. Ritch, Olive Marion Braswell, Victor M. Ritch, Watson L. Ritch, Elizabeth Ann Ritch Longley and Susan Jane Ritch, defendants.

Hinkle, Bondurant, Cox & Eaton, Roswell, N. M., for G. B. Oliver and Apdre James Oliver, Maude Oliver Rathgeber, Henry J. Oliver and Martha O. Sayles, Henry & Ethel Shores, Carmen McDonald, Howard Glenn McDonald, G. B. Oliver, Jr., defendants.

## MEMORANDUM OPINION

PAYNE, Chief Judge.

The subject of this opinion arises from eight separate actions [1] by the

---

1. All eight actions are land condemnation actions by the United States and concern the same area. Each action, however, involves different tracts of land although within the same general area. It should be noted that certain judgments have been entered in three of the actions. Those judgments affect forty of the 441 tracts concerned in these eight actions. Those three judgments were filed on April 9, 1974, and are currently on appeal to the Tenth Circuit Court of Appeals on the question of the amount of just compensation which the Government must pay for the tracts condemned. The appeal was filed by the United States.

The Court initially hesitated to write this opinion because of the pending appeals.

"The general rule is that when an appeal is taken from the District Court the latter court is divested of jurisdiction. . . . " 7 Moore's Federal Practice ¶ 60.30[2] p. 419. However, "where an appeal is taken from a judgment which does not finally determine the entire action, the appeal does not prevent the District Court from proceeding with matters not involved in the appeal." 9 Moore's Federal Practice ¶ 203.-11, p. 739. The question of just compensation is on appeal but the subject of who is to receive the compensation, the basis of the government's motion filed November 1, 1974, is apparently not before the Appellate Court. The purpose of this opinion is to only summarize past rulings the Court has

United States in which the United States is condemning various estates. The land condemned is to be used in connection with the White Sands Missile Range in south central New Mexico.

It is imperative from the outset that it be made clear that these actions involve the taking of property by the United States on a leasehold basis. The fee title is not affected and remains with the owners of the various estates and is not vested in the United States. The condemnation of each estate involved is for a term of one year beginning July 1, 1970, and ending June 30, 1971, extending for yearly periods thereafter at the election of the United States, until June 30, 1980.[2]

The several actions together cover thousands of acres and involve 441 tracts of land owned privately in fee and by the State of New Mexico. The State owned tracts are part of the lands granted and confirmed by the United States to the State of New Mexico under the New Mexico-Arizona Enabling Act (Act of June 20, 1910, 36 Stat. 557 as amended). The private lands involve approximately 50 ranches of varying sizes. The ranches, however, do not consist only of privately owned land. The ranches are comprised of private land owned in fee, State land leased from the State of New Mexico for grazing and general ranching purposes pursuant to the trust provisions as set forth in the Enabling Act and lands of the United States upon which the ranchers have had grazing privileges by reason of the Taylor Grazing Act (see Title 43 U.S.C. §§ 315–315g, 315h–315m, 315n and 315o–1). The Taylor Grazing Act authorizes the Secretary of the Interior to issue permits to livestock owners for grazing their stock on Federal Government lands. These permits are revocable by the Government. The lands subject to the grazing privileges of the Taylor Grazing Act are not within the consideration of the current condemnation actions. A contention was made, in the

made and also to rule on the government's motion of November 1, 1974. In writing this opinion, the Court is by no means attempting to alter, amend or change any judgment it has made as concerns just compensation or any other subject.

2. The reader of this opinion should be aware that these actions are concerned only with certain condemnation proceedings which will be in effect during the decade of 1970 through 1980. The United States Government, however, has been involved with this area for many years prior to the date of the current actions.

The history of White Sands Missile Range begins back in the early 1940's. The importance of the White Sands Missile Range would possibly mean more if the date of July 16, 1945, was remembered. That is the date the world's first nuclear device was exploded at the Trinity Site on the White Sands Missile Range. Three weeks later, on August 6, 1945, Hiroshima, Japan, was devastated by a similar device as was Nagasaki, Japan, on August 9, 1945.

In the earlier days the area was used in conjunction with the Holloman Air Force Base located near Alamogordo, New Mexico. White Sands Missile Range was then labeled the Alamogordo Bombing Range. In later years it was named the White Sands Proving Grounds and finally the nomenclature was changed to present day White Sands Missile Range. The Range consists of federal land, land belonging to the State of New Mexico and private land owned in fee.

Throughout the period from the early 40's until the present, the United States Government generally, and the United States Army in particular, has, in one way or another, had control of much of the private fee land and State land in the area. This has generally been accomplished through various types of lease arrangements between the federal government and the individual land owners. Similarly, the actions which are the subject of this opinion involve the Government taking by leases as opposed to obtaining fee title to the lands. Many of the prior lease arrangements have or will expire and therefore necessitate the present and possibly other condemnation proceedings.

It is the understanding of this Court that the United States Congress has or is in the process of authorizing purchase in fee of parts of the White Sands Missile Range not now owned by the Federal Government. Regardless, the current actions are condemnations on a leasehold basis and do not affect the fee title.

answers of some of the defendants at the outset of these several actions, that the Taylor grazing lands should be considered in the determination of just compensation in that the fee land condemned is to be valued as enhanced by the Taylor grazing permits. In February of 1971, the plaintiff United States filed a Motion To Strike from the defendants' answer any reference to the terminated Taylor grazing permits. The Motion was subsequently granted by the Court. The basis of the Court's ruling, as it concerned the Motion To Strike, is set forth very distinctly in one portion of the Court's unpublished memorandum opinion dated June 3, 1971. The Court states that:

"No Taylor Grazing Land is being condemned and it is clear that all Taylor grazing permits were previously cancelled. The United States does not have to condemn that which it already owns."

■ Apparently this Court was correct in its ruling that the commission was not to consider the availability or accessability of the Taylor grazing permits. A recent United States Supreme Court decision is exactly in point. *See* United States v. Fuller, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). The *Fuller* Court stated, in part as follows:

"If, as in *Rands*, [389 U.S. 121, 88 S. Ct. 265, 19 L.Ed.2d 329] the Government need not pay for value that it could have acquired by exercise of a servitude arising under the commerce power, it would seem a fortiori that it need not compensate for value that it could remove by revocation of a permit for the use of lands that it owned outright." *Fuller* at 492, 93 S. Ct. at 804.

The Court further stated:

"The provisions of the Taylor Grazing Act quoted *supra* make clear the congressional intent that no compensable property right be created in the permit lands themselves as a result of the issuance of the permit. Given that intent, it would be unusual, we think, for Congress to have turned around and authorized compensation for the value added to fee lands by their potential use in connection with permit lands. We find no such authorization in the applicable congressional enactments." *Fuller* at 494, 93 S.Ct. at 805.

Once again, this Court is *not* considering the Taylor grazing lands. The purpose of this opinion is to briefly [3] set forth the Court's reasoning concerning certain legal conclusions that have generated much debate throughout the pendency , of these condemnation proceedings.

It would seem that at this juncture a brief history of the pleadings, motions, etc., that have been the catalytic force behind the subject of this opinion is in order.

Most of the complaints were filed during the early summer of 1970. The next two years saw the government and the defendants, after the defendants had answered, argue various legal points at hearings and on the basis of motions and accompanying briefs. One of the major legal arguments, as already discussed, was whether the Taylor grazing lands were to be considered in these condemnation actions. Then there were purely procedural matters that had to be resolved such as whether to have a jury or a commission hear the various cases. Finally, in the spring of 1972, the Court

---

3. It should be emphasized that the Court is attempting to only *briefly* set forth its views. Soon these actions will have been ongoing for five years and many pages of briefs and other pleadings have been filed during this period. Consequently, just a listing of the authorities cited by the many briefs would be voluminous. The general statements and conclusions in this opinion are only intended to be a summary of the more technical and detailed contentions and rulings previously made during these lengthy and drawn out proceedings. The Court does not intend to slight the very important matters raised in these actions but the dictates of time simply do not allow the more justified lengthy and detailed opinion.

appointed the three commissioners [4] who would ultimately conduct the hearings involved. During the same period the Court filed its instructions to the commission. Subsequently, the Government filed its first request for supplemental instructions to the commission. Those requested instructions read as follows:

### Requested Supplemental Instruction No. 1

In determining the fair market rental value of each ownership unit (private or state) you shall totally disregard the availability of all public domain land for grazing or other purposes.

### Requested Supplemental Instruction No. 2

You may, for trial purposes only, consolidate certain privately-owned parcels of land with certain state-owned parcels, but you may not consider them together as one ownership unit. In this connection, you are required to make a separate evaluation and render a separate award for each ownership unit.

Several briefs were filed and a hearing was held before the Court on July 18, 1972. Subsequently, more briefs were filed and much corresponding ensued between the Court and the counsel involved. The end result was that the Court granted the Government's Requested Instruction No. 1, denied Instruction No. 2, and allowed a supplemental instruction by which the commission might consider rental paid on comparable leases if, in fact, the commission decided the leases were comparable. Further, the commission was to decide the weight to be given to the evidence of the comparable leases. The commission then proceeded with the hearings and issued various reports. At times objections to the commissioner's reports were filed. However, the objections were ultimately resolved by the Court. Eventually orders for disbursements were made and in fact monies have been paid to many of the defendants.

In August of 1974, the Government filed its second request for supplemental instructions to the commission. Once again briefs were filed and the Court held a hearing. The Court denied the Government's request for supplemental instructions in a letter dated September 6, 1974. The Court stated in that letter that it would issue an opinion at a later date. The reason for the later opinion was that the Government had indicated, after the hearing on the requested instructions, that there were some other contentions which they sought to raise and that said contentions should also be covered by the Court's opinion.

On November 1, 1974, the Government filed a document which was simply captioned "Motion". Several briefs in support and briefs in response have been filed, the latest being filed by the Government on December 18, 1974. Now the stage is set for a final ruling on the Government's motion of November 1, 1974. Such a ruling should lie to rest, subject to certain appeal, any doubt of this Court's position on the questioned matters.

Hopefully the brief survey of these actions has somewhat oriented and acquainted the reader with these ultimately complex, or at least lengthy, actions.

In very basic terms the question which the Court has continuously had to contend with is who is entitled to compensation for what? More accurately, is the valuation of the ranches and the land leased from the State to be as a unit or are the private ranch lands to be valued without any consideration for the fact that a good portion of the ranches consist of the land leased from the

---

4. The commission members are Mr. William W. Bivins, attorney at law, Dr. Roger B. Corbett and Mr. Sherwood Culbertson. Although it seems that these proceedings are far from complete, the Court, at this time, wishes to express its sincere appreciation to the commission members for their excellent and devoted efforts throughout these proceedings.

State? The latter question begs a further question. Are the ranchers to be compensated not only for their private land but also for the land which they have leased from the State of New Mexico, or, is the State to be compensated for this leased land?[5]

It has been a ruling of this Court, over the continuous and strenuous objections of the Government, that the ranches are to be considered a unit even if the unit includes land leased from the State. Furthermore, it has been the position of the Court that the ranchers and not the State are to be compensated for the land leased from the State.

The Government contends, in their latest brief, filed on December 18, 1974, that "[t]he question of who is entitled to receive the compensation—the central issue of plaintiff's motion—has not been adjudicated as to any tract." The Government further states that "[t]he judgments under appeal relate solely to the question of the amount of just compensation which plaintiff must pay for the tracts condemned."[6]

The Court has and continues to reason that the former Government statement is practically synonymous with the latter. When the Court determined that the commission should consider the privately owned parcels of land together with the leased State owned parcels, and regard both as one ownership unit for valuation purposes, the import was that the Court was inferring that the rancher is to receive the compensation for the entire unit. In fact the Second Requested Supplemental Instruction of the Government, filed on June 13, 1972, stated in part that " . . . you are required to make a separate evaluation *and render a separate award for each ownership unit.*" (emphasis added). That instruction was denied, among other reasons, because the Court reasoned

that the private fee land and the land leased from the State were to be valued as a unit and that only one award was to be made for the entire unit. It would seem *a fortiori* that the rancher, not the State, would be compensated for the land leased from the State. In fact the Court stated in its letter of September 6, 1974, as follows:

> "This Court has decided that the leases belong to the landholders and that such leases are valuable property . . . . The Court recognized in that opinion [American Mortgage Co. v. White et al., 34 N.M. 602, 287 P. 702 (1930)] that a grazing lease was a valuable property right belonging to the ranchers."

█ It would now appear, however, that the Court has read more into its past rulings than was obvious to the counsel concerned. Regardless, the Court now reaffirms its past position that compensation is to be based on a valuation formula which includes both the State owned lands leased by the defendants as well as the fee lands of the defendants as one ownership unit. Furthermore, the Court hereby denies the Government's motion of December 18, 1974, and categorically rules that the defendants who have grazing leases of State owned tracts have compensable interests therein, that said defendants are to receive, upon distribution of the proceedings, the condemnation award for the lands they have leased from the State. And, finally, that the leases of the State owned tracts executed or renewed by the State of New Mexico after July 1, 1970, create in the lessee a property interest compensable in these proceedings.

The Court's reasoning, as concerns these actions, has always been premised by the fact that the Government is condemning for the purpose of a leasehold

---

5. Thus, the State of New Mexico is to be compensated for its land which is not leased to private individuals. The private individuals, generally ranchers, are to be compensated for the land they hold in fee. The problem arises with the land the ranchers have leased from the State for grazing and general ranching purposes.

6. The judgments to which the Government is referring are those discussed in Footnote 1 of this opinion.

estate. The actions are not concerned with fee condemnations. A temporary taking is different than a permanent taking. The following statement was made by the United States Supreme Court:

"It is altogether another matter when the Government does not take his entire interest, but by the form of its proceeding chops it into bits, of which it takes only what it wants, however few or minute, and leaves him holding the remainder, which may then be altogether useless to him, refusing to pay more than the 'market rental value' for the use of the chips so cut off. This is neither the 'taking' nor the 'just compensation' the Fifth Amendment contemplates." United States v. General Motors Corp., 323 U.S. 373 at 382, 65 S.Ct. 357, 361, 89 L.Ed. 311 (1945)

The *General Motors* condemnation was also one where the Government condemned a lease for one year with an option to renew. *General Motors* involved a defendant who occupied an automobile parts warehouse and did not involve vast acreages of real property as in the instant actions. *General Motors* did, however, involve a temporary taking as do the current actions.

 Now to first discuss the valuation question. Once having premised its reasoning as aforementioned, the Court earlier in these proceedings, determined that the commission was to consider the value of the private lands in conjunction with the land leased from the State. That is, the privately owned parcels of land and the State owned parcels were to be considered together as one ownership unit for valuation purposes. It has been the Government's position that the two could not be considered as one unit for valuation purposes. The Government's position is based primarily on the status of the title to the land. The Government stated in a brief filed on July 31, 1972, that "[b]eing separate parcels they cannot be joined together in the 'before' or 'after' valuation determination . . . ." The Court is aware of the general rule that "tracts held by different titles vested in different persons cannot be considered as a whole . . . although the tracts are used as one." 18 Am.Jur., Eminent Domain, § 271; *see also* United States v. 2979.72 Acres of Land, 270 F.2d 707 (4 Cir., 1959). The Government relies heavily on this general principle and reasons that simply because the land is contiguous because of the common use by the defendants, it is not to be considered as one parcel, for valuation purposes, when owned by different parties.

There is more than ample authority for the Government's position on valuation were it not for certain distinctions in the instant cases which seem to set them apart from the realms of generalities. These actions simply do not fit in the general mold the Government emphasizes.

The general mold is arguably not applicable for equitable reasons. The Court read with interest an ALR 2d Annotation [7] concerning the measure of damages to be applied to determine the amount of compensation to be awarded to a lessee whose property interest is taken and the particular element of damage recoverable by the lessee. The annotation does not exactly deal with the valuation problem confronted by this Court but it does focus on equitable considerations when condemnation of leasehold interests are concerned. The annotation stated the general rule that the market value of the leasehold is to be the measure of damages for the taking of the leasehold. The annotation goes on to say, however, that such a general rule is not easy to apply when condemning leaseholds and in fact cannot be applied at times. The annotation states as follows:

" . . . in some instances there has been a recognition of the fact that a leasehold may not have a market value. Leaseholds are not ordinarily

the subject of sale on the market, and vary so much in the length of term, rent, and other particulars, including the nature of the property demised, and its particular use by the lessee, that applying market value as the criterion for determining the value of the leasehold may, in some circumstances, be impossible or might produce inequitable results."

The annotation further states:

"There have been occasions where the court seemed to follow this view and other occasions where a court has deviated from the customary practice of applying market value as the measure of damages for the taking of a leasehold and applied some formula which the court believed would reach a more equitable result under the circumstances."

This Court would submit that just as equity may find need for other than the general rule of applying market value as the measure of damages for the taking of a leasehold and in fact apply a formula which would result in a more equitable result, valuation of parcels of land used in common and as a practical matter considered as a ranching unit but vested of different titles sometimes requires a deviation from the previously discussed general rule and requires, in the alternative, a more equitable rule.

It is not equitable to value the land leased from the State and private land separately and as isolated tracts. For example, most of the State leases involved in these actions are on rather dry and arid lands. These lands have been used for decades as general ranching land, primarily for grazing purposes. In fact, if one were to view this particular area of the dry southwest, he would realize that grazing, as sparse as the vegetation is, is about the only use to which the rancher may put the land. Without some water for stock watering

purposes, however, the land leased from the State is simply not even productive grazing lands. Generally the water is to be found on the private fee land. Therefore, the value of the land leased from the State, without any consideration for the available water on the private fee lands, is negligible. A valuation of the land leased from the State as isolated tracts, in most instances, would be inequitable in that for decades the marginal value of the land leased from the State has been only in conjunction with private fee lands.[8]

The same reasoning would apply to the value of the private fee lands. These lands are also used primarily for grazing purposes. Yet "grazing" in this part of the southwest necessitates a larger area per animal due to the lack of vegetation and forage. A rancher will very often depend on his State lease rights to obtain the necessary area in which to graze a profitable (and all too often less than profitable) number of animals.

Again, without the land leased from the state, the value of the ranches would be diminished substantially if not totally. To value the ranch without including the land leased from the State is to render an inequitable value.

The Court is not unmindful of the fact that usually the State leases do not include the right to develop minerals. The minerals portion of the condemnation is in the main handled directly with the State of New Mexico. Therefore, the award for the private fee land might include rental value of the mineral interest while the award for the State lands will exclude mineral interest. This occurrence is not an insurmountable barrier to a proper valuation of the land leased from the State and the private land as a unit. The Commissioners are very much aware of such value differentials and can adequately adjust the particular awards.

8. This is not to ignore the fact, however, that these are situations where the water is found on the land leased from the State and in such instances, of course, the value of the land leased from the State is not negligible.

Aside from equitable considerations, generally agricultural and rural lands have found a special niche in condemnation proceedings.

> "The rule is general that however nominally divided . . ., if the whole area is used together for a farm, ranch, or other appropriate purpose, it is to be considered one property. Moreover, the fact that different portions of a farm, ranch, or other rural holdings were acquired from different persons, *or are otherwise held under different titles,* will not prevent its being treated as an entirety in the assessments of damages for a taking of a part, if the whole area is held and operated as a single property." (omitting citations; emphasis added)); *see also* 6 ALR 2d 1217 § 9.

Finally, as concerns the valuation question, in support of their position the Government cites the recent Ninth Circuit case of United States v. 2562.92 Acres in Yuma And Mohave Counties, State of Arizona, 495 F.2d 12 (1974).[9] In that case the lands are being condemned *in fee* and did not involve the condemnation of a *leasehold interest.* The defendants in the instant actions, through renewal of their State leases,[10] have an ongoing interest in these lands condemned on a *leasehold* basis. Once the condemnation term expires, the land reverts to the State's use and subsequently to the defendant's use through their still existing State leases. The State lease has value to the defendant prior to the seizure for public use and will have value after the public use terminates. This is a different situation than with fee condemnations and valuation considerations are also different.[11] The Government also cites United States v. Honolulu Plantation Company, 182 F. 2d 172 (9 Cir. 1950), cert. den. 340 U.S.

420, 71 S.Ct. 51, 95 L.Ed. 602 (1950). Again, this case dealt with lands being condemned in fee.

In conclusion, as concerns the valuation question, the Court finds just cause for the position that the privately owned parcels of land and the State owned parcels are to be considered together as one ownership unit for valuation purposes.

Now to discuss the question of whether the defendant lessees or the State of New Mexico is to receive the compensation for the land leased from the State. It is the Government's position that one award should be made to the individual defendants for the private lands and a separate award to the State of New Mexico for the lands leased from the State. The Government has filed a motion (motion of November 1, 1974) which in part seeks an order of the Court stating as follows:

> "The State of New Mexico is entitled to the entire amount of just compensation . . . . The grazing lessees . . . have no compensable interest therein . . . . [except] to receive . . . reimbursement for prepaid rentals that are allocable to the period of Government's occupancy subsequent to July 1, 1970."

The Government's proposed order would further read as follows:

> "No purported lease of any tract . . hereof executed or renewed by the State of New Mexico after July 1, 1970, created in the purported lessee a property interest compensable in the proceeding."

The Court will deny the Government's motion for several reasons as will briefly be discussed.

In the instant actions the defendant lessees were provided a lease in accordance with the provisions of the Enabling

---

9. This case is currently on appeal to the United States Supreme Court.

10. The Government contends the State had no capacity to renew the leases, as discussed *infra.*

11. The real importance of the *Yuma* case is found in its ruling that the lessees do not have, in the State leases, a compensable interest other than for improvements. This is discussed *infra* in this opinion.

Act. Section 10 of that Act provided in part as follows:

"Provided, That nothing herein contained shall prevent said proposed State from leasing any of said lands referred to in this section for a term of five years or less without said advertisement herein required."

■ Clearly the trustee had authority to lease the lands in question. Furthermore, as a general rule, a lessee is entitled to compensation for his interest in the condemned property. See 26 Am-Jur2d Eminent Domain Section 177; see also 152 ALR 307. The question before this Court is whether the lessees of the State lands have such a compensable interest.

The defendants contend they have a very real interest which is in fact compensable. The basis of the defendants' contention is that the leased lands are imperative to their whole ranching program. As discussed previously, very often, if not usually, the private lands cannot function at a profitable level without the use of the land leased from the State. Furthermore, financial institutions of New Mexico have, as a matter of policy, reasoned the ranchers have a valuable interest. This is borne out in that the leases are very often used as collateral by the ranchers to obtain loans from these institutions.[12] The Government denies the existence of such a compensable interest.[13]

■ The Government argues their position is sustained by decisions in Lassen v. Arizona Highway Department,

385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967), and United States v. 2,562.-92 Acres in Yuma And Mohave Counties, State of Arizona, 495 F.2d 12 (9 Cir. 1974). These cases deal with the right of the trust, or the State of Arizona as trustee, to be compensated for the taking of certain lands. The lands involved in these two cases are similar to the lands in the instant actions in that they were granted to Arizona through the New Mexico-Arizona Enabling Act. The condemnation proceedings involved in these cases and the condemnation proceedings in the instant actions are, however, dissimilar. Lassen held that the Arizona Highway Department had to compensate the trust for certain lands acquired by the department which were to be used for rights of way and material sites. These acquisitions were for indefinite periods and are not analogous to the instant actions. Yuma is inappropriate authority. Yuma did hold that Arizona, as trustee, could not grant a compensable property interest to the individuals who had leased land from the trust. As discussed previously, the lands therein, however, were condemned in fee and the current condemnation proceedings involve only the taking of a leasehold interest. The leasehold interest of the Government will, under the terms of the condemnation, ultimately expire and the lands will then revert back to the trustee or to whom the State has leased the lands. Therefore, those who have leases at the time of the taking would seem to have a compensable interest.[14] Furthermore, the State is

12. A New Mexico case, American Mortgage Co. v. White et al., 34 N.M. 602, 287 p. 702 (1930), has held that an assignment of a State grazing lease is not in violation of the Enabling Act.

13. The Government's position, in part, is seemingly contrary. The Government contends the lessees have no compensable interest yet the Internal Revenue Service will presumably consider the lease as a part of the estate for Federal Estate Tax purposes if in fact the lease is listed among the assets of the gross estate.

14. The Court will deny part four of the Government's motion which concerns renewal of the leases. There is a type of ultimate reversionary interest in the trustee. If the trustee determines that the leases are to be renewed such would seem to be a matter of trust administration and well within the proper discretion of the trustee. Presumably the trustee desires to maintain the leases of the private individuals in anticipation of the expiration of the Government's leaseholds obtained in these condemnation actions. Nevertheless, it is not for this Court to hypothesize the basis for the trustees' ac-

not permanently losing its interest in a condemnation on a leasehold basis. The fee remains in the State. Condemnations in fee are different. There the State permanently parts with the land.

If there is in fact no distinction to be found between a condemnation of land in fee or on a leasehold basis, the Court nevertheless reasons that *Yuma* is in direct conflict with Nebraska v. United States, 164 F.2d 866 (8 Cir. 1947). That case held the lessees did in fact have a compensable interest even though the case involved a condemnation in fee. The Government argues that *Nebraska* and *Yuma* construe different enabling acts and are therefore not conflicting. The enabling acts may be different but upon reading the opinion, it appears *Nebraska* held as a matter of Federal law that a lessee is entitled to compensation. The State of Nebraska sought to apply Nebraska law to the condemnation proceedings "[b]ut these considerations and concepts are not controlling in this proceeding. What constitutes property and what is just compensation for it in a condemnation by the United States are not questions of state law but of federal law." 164 F.2d at 867.

Even if *Nebraska* were not in conflict with *Yuma*, a New Mexico Supreme Court case is apparently in conflict with *Yuma*. The case of American Mortgage Co. v. White et al., 34 N.M. 602, 287 P. 208 (1930) held that the assignment of a State grazing lease as collateral security is not in violation of the provisions of the Enabling Act. In recognizing the lease as a type of collateral, the Court was similarly recognizing a valuable property right which belonged to the lessee. *Cf.* State ex rel. State Highway Commission v. Chavez, 80 N.M. 394, 456 P.2d 868 (1969). Arguably that same Court would have found, in the instant

actions, that the defendant lessees have a compensable property interest.[15] Regardless, this Court is so holding.

Throughout these proceedings the Court has attempted to only be fair to all parties concerned and has placed much reliance upon basic equitable principles. Many times the Court has found solace in the following statement from a recent United States Supreme Court decision:

"The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, as it does from technical concepts of property law." (Omitting citations); United States v. Fuller, 409 U.S. at 490, 93 S.Ct. at 803 (1973)

The Government's motion of November 1, 1974, is hereby denied. It is so ordered.

---

tions. The Court finds, however, nothing wrong in a renewal of these leases by the trustee.

15. In passing, it is interesting to note that S. G. Bratton of Albuquerque was one of the attorneys making the contention that there

is no violation of the Enabling Act when a grazing lease is assigned as collateral security. Presumably he is the same Sam G. Bratton who later became a Senator from New Mexico and ultimately Chief Judge of the Tenth Circuit Court of Appeals.