**Emma HOUSER, a widow, and Frances Houser Larson Hampton, a married woman, dealing with her sole and separate property**

v.

**The UNITED STATES and The State of Idaho, Third-party Defendant.**

No. 559–77.

United States Claims Court.

May 29, 1987.

---

Paul Sinnitt, Tacoma, Wash., with whom was Wynne M. Blake, Lewiston, Idaho, for plaintiffs.

Alan Brenner, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, for defendant.

Robie G. Russell, Deputy Atty. Gen., State of Idaho, Boise, for third-party defendant.

## OPINION

YOCK, Judge.

Plaintiffs seek just compensation under the Tucker Act, 28 U.S.C. § 1491 (1982), for the alleged taking by inverse condemnation of real estate which they claim to have owned along the Snake River in the City of Lewiston, Idaho. This land was condemned in a United States District Court condemnation proceeding to which plaintiffs were not named as parties nor personally served with notice of the action. Plaintiffs argue in this case that at the time of the condemnation proceedings in the district court, they were the fee owners of the land and that compensation was paid to the wrong party, i.e., the State of Idaho, the third-party defendant herein.

In an earlier opinion, this Court denied a motion for summary judgment by the Government, in which the Government argued that the plaintiffs were bound, under the doctrine of res judicata, by the earlier district court condemnation proceeding. In addition, the Court denied the parties' cross-motions on the issue of ownership. See Houser v. United States, 9 Cl.Ct. 35 (1985). Thereafter, trial was held on April 28–30, 1986, at the United States District Court facilities in Moscow, Idaho, as to both liability (i.e., ownership) and damages.

Upon full consideration of the entire trial record, including the parties' post-trial proposed findings of fact and conclusions of law, the Court finds for the plaintiffs in this action. The Court finds that the plaintiffs were, in fact, the fee owners of the real estate at issue in this case. Furthermore, the Court concludes that the plaintiffs' property had a fair market value, at the time of the taking on December 18, 1972, of $102,000. Plaintiffs are entitled to recover that amount, plus interest, as just compensation. They are also entitled to an award for their reasonable costs, disbursements and expenses, including attorneys' fees, incurred in connection with these proceedings. Additionally, judgment, in the amount of $34,320, is rendered against the third-party defendant State of Idaho and in favor of the United States.

### Facts

On December 18, 1972, the United States of America filed a Complaint, Notice and Declaration of Taking in the United States District Court for the District of Idaho in Civil Docket No. 3–72–52, United States of America v. 8.32 Acres of Land, condemning in fee a 3.12 acre parcel of land now known as Tract 1202 located in the City of Lewiston, Nez Perce County, Idaho. The State of Idaho and "any and all unknown owners" were named as defendants in that action. Tract 1202, condemned by the United States Government in that action for the Lower Granite Lock and Dam Project, is bordered on the west by the Snake River, and on the east by land acquired by plaintiffs in 1945 and referred to as Tract 1201. As a result of the filling of the reservoir created by the Lower Granite Lock and Dam Project, Tracts 1201 and 1202 are now both submerged under several feet of water, except for a portion occupied by a levee, constructed by the United States Army Corps of Engineers.[1]

Tract 1201 was initially a part of an 88.5 acre tract of land abutting the eastern bank of the Snake River, which was ac-

---

1. These tracts of land were artificially designated as Tracts 1201 and 1202 by the United States Government as it was preparing to condemn the land needed for the Lower Granite Lock and

Dam Project in the early 1960's. The 1201 and 1202 tract designations bore no relationship to the legal description of the land itself.

quired by patent from the United States Government in 1882 by one Mr. William T. Cox. The United States Government, of course, had run the original land survey of all the land in the public domain including this 88.5 acre tract of land at issue in this case. The western boundary of the 88.5 acres of land which abutted the east bank of the Snake River was delineated in the survey and in the original plats taken from the survey by the use of a meander line, used to connote the sinuosities of the Snake River. Between 1882 and 1898, when he died, Mr. Cox proceeded to lay out and record a subdivision on the patented land known as "Cox's Addition to the City of Lewiston." In addition to selling most of the lots contained in this Cox's Addition subdivision, he subdivided and sold other parcels of land out of the patented 88.5 acre tract to various unrelated purchasers, and he dedicated certain streets to the city.

Upon Mr. Cox's death in 1898, an administrator was appointed by the probate court of Nez Perce County to settle his estate. Mr. Frank A. Robinson, Mr. Cox's son-in-law, was the appointed administrator. One of the first acts of Mr. Robinson, as the administrator, was to petition the probate court to sell all of the real and personal property remaining in the estate to satisfy outstanding debts, since Mr. Cox's debts were in excess of his assets. After the court had granted the administrator's petition to sell all real estate and personal property assets on December 30, 1898, the administrator published in the Lewiston Idaho Tribune several Notices of Sale in February 1899 of all of Mr. Cox's real estate. The real estate that was to be sold was described in the following legal description:

> That tract or parcel of land lying and being in the county of Nez Perce, state of Idaho, as follows: Commencing at the southwest corner *Lot (3) three, Section (1) one, township 35, N.R. 6 W.B.M.,* thence in a northerly direction *down east bank of Snake river 924 feet;* thence east 450 feet; thence south 900 feet; thence west 400 feet to point of beginning, *containing (6) six acres more or less,* * * *. [Emphasis supplied.]

A sale was held pursuant to the notice of the administrator who reported to the probate court on June 23, 1899, that only one bid was received, for $900, from a Mrs. N.C. Sanford. The administrator's Return Of Sale recites that the property actually sold to Mrs. Sanford is described by an amended description. The document stated:

> [T]he said real estate is thereupon sold to her for the price aforesaid. [T]he property actually sold of which the following is an *amended* description, is described as follow[s] viz;
>
> The part of Lot 3, Sec. 1, Tp. 35, N.R. 6, W.B.M., commencing at a stone marked with a cross at the Southwest corner of the 40 acres now owned by W.H. Holcomb in said Lot 3; thence North 333.2 feet on the West line of said 40 acre lot, to a point; thence N. 84° W. 178.2 feet, on the South boundary line of the Cox Addition to Lewiston, Idaho, to a point; thence S. 6° W. 20 feet on the east line of Montgomery Street in the Cox Addition to the intersection of the West line of said Montgomery Street with the South line of the 40 foot Street on the South boundary of the Cox Addition; thence on the South line of said 40 foot street 245 feet to *the meander line of Lot 3, Sec. 1 Tp. 35, N.R. 6 W.B.M.,* thence *Southerly on said Meander line* 354 feet to a point on the South line of lot 3 distant 465 feet to the point of beginning, thence East on the South line of Lot 3, 465 feet to the point of beginning, *containing 3.28 acres,* in Nez Perce County, state of Idaho. [Emphasis supplied.]

The real estate actually sold to Mrs. Sanford from the Cox Estate, evidenced by that Return of Sale document and deed, differs substantially from the real estate offered for sale by the administrator. The legal description contained in Mrs. Sanford's deed of conveyance and the Return of Sale document differ in four respects: (1) the amended legal description commenced at a stone monument which was not described in the legal description con-

tained in the original Notice of Sale; (2) in the amended description, the property is described by metes and bounds instead of section, township and range; (3) the western boundary is now referred to as a meander line instead of the east bank of the Snake River; and (4) it concludes by stating "containing 3.28 acres" rather than "(6) six acres." Also, the words "more or less" are removed from the deed and the Return of Sale document as it pertains to the acreage described. This *amended* 3.28 acre description used in the deed of conveyance to Mrs. Sanford in 1899 is used in every subsequent conveyance in the chain of title to the property at issue down to the deed to the Housers in 1945, with the exception that in the deed from Mr. Guy Richards to the Housers in 1945, the phrase "more or less" is inserted after the 3.28 acres.

Sometime in the early 1960's, the United States Army Corps of Engineers (Corps) began preliminary work on the Lower Granite Lock and Dam Project. In preparation for this project, the Corps, on November 20, 1964, ordered from the North Idaho Title Company, located in Lewiston, several preliminary certificates of title to cover lands that were to be condemned for the project in Nez Perce County, Idaho. As a part of this order, the title company issued its Preliminary Certificate of Title involving Tract 1201 on June 28, 1965. The certificate recited the same property description as was used in the Cox Estate conveyance to Mrs. N.C. Sanford in 1899 and all subsequent conveyances down to and including the conveyance from Mr. Guy Richards to the Housers in 1945 (minus the language pertaining to acreage). The certificate stated that "Emma Houser and Frances Houser Larson, as their interests may appear," were indefeasibly vested in fee simple ownership of Tract 1201. In addition, Schedule B of the certificate listed the following germane exceptions:

3. Right of way easement from Emma Houser, a widow, to The Washington Water Power Company dated January 31, 1964 and recorded as Instrument No. 300892 records of Nez Perce County Idaho, on January 31, 1964.

4. Any claim arising from the difference in the mean high water line of the Snake River and the meander line as shown by the Government survey.

Here the matter rested until the Corps discovered that there was considerable land (about three acres) to the west (river side) of the western border of Tract 1201. The Corps thereupon designated this three-acre tract as Tract 1202 and requested from the North Idaho Title Company another preliminary title certificate as to the ownership of Tract 1202. On December 28, 1971, the title company issued its Preliminary Title Certificate pertaining to Tract 1202. The certificate stated that the tract was "indefeasibly vested in fee simple" ownership in the State of Idaho. The germane Schedule B exceptions to that ownership were listed as:

2. Parties in possession or claiming any right to possession.

3. Any claims arising from the difference in the mean high water line of the Snake River and the meander line as shown by the Government Survey.

After digesting this title certificate, the Corps apparently had some further questions about the exceptions listed and, by letter dated May 16, 1972, inquired into these questions with the title company. Thereafter, on June 8, 1972, over six months prior to the actual district court condemnation action, the title company issued its Second Preliminary Certificate of Title pertaining to Tract 1202. The title company again reiterated that the property was "indefeasibly vested in fee simple" ownership in the State of Idaho. However, it added another germane exception to the initial three. The fourth exception listed stated:

4. Right, title and interest of Emma Houser and Frances Houser Larson by virtue of the fact this land is an extension to the west of their property on the East and could be determined to be land gained by accretion.

A follow-up letter of June 14, 1972, to the Corps emphasized the significance of the fourth exception listed in the Second Preliminary Title Certificate by stating:

Dear Dee:

This land is the former river bed of the Snake River and is now above the mean high water line of said River and therefore land created by accreation [sic] or avulsion.

The letter was signed by Mr. Holden Mitchell, the manager of the North Idaho Title Company.

Notwithstanding the exceptions clearly listed in the title certificates, and especially exception 4 in the Second Preliminary Title Certificate, which specifically named the Housers as having a potential interest in Tract 1202, the plaintiffs were not named as interested parties to the Tract 1202 condemnation action, nor were they or their agents personally served with notice of the condemnation complaint and declaration of taking filed by the U.S. Attorney in the United States District Court for the District of Idaho on December 18, 1972. *See Houser v. United States,* 9 Cl.Ct. 35, 38–43 (1985). The Government, however, did publish the routine notices to "unknown owners." *See* Rule 71A, Fed.R.Civ.P. Upon a stipulation between the United States of America and the State of Idaho, judgment in the sum of $34,320 was rendered by the District Court for the District of Idaho as just compensation for the taking and distributed in full to the State of Idaho, as the fee owner of the property, on or shortly after December 18, 1972, the same day that the Government had filed its Complaint and Declaration of Taking in the district court.

On May 22, 1973, some five months after the Government condemned Tract 1202, the Government commenced a condemnation action involving Tract 1201 in the same United States District Court for the District of Idaho. *United States of America v. 1.75 Acres of Land,* Civil No. 3–73–24. Tract 1201 lies immediately to the east of Tract 1202. The plaintiffs in this action were personally served with notice by receiving a copy of the Complaint and the Declaration of Taking in the Tract 1201 condemnation action. In March 1976, while awaiting trial in the Tract 1201 action, the plaintiffs attempted to reopen the Tract 1202 condemnation judgment and have it consolidated for trial with the Tract 1201 action, since they were claiming ownership of both contiguous tracts of land. The District Court, however, refused to reopen the Tract 1202 judgment rendered in 1972 and suggested that the Tucker Act (28 U.S.C. § 1491) permitted an inverse condemnation claim to be made to the United States Court of Claims. The district court then proceeded to render judgment for the plaintiffs only as to Tract 1201.

Plaintiffs thereafter filed suit on November 18, 1977, in the Court of Claims, this Court's predecessor tribunal. The case was transferred to the United States Claims Court on October 1, 1982, pursuant to the authority contained in section 403(d) of the Federal Courts Improvement Act of 1982. Pub.L. No. 97–164, 96 Stat. 25.

On April 1, 1983, plaintiffs filed a motion for partial summary judgment on the issue of ownership. The defendant and the third-party defendant thereafter filed cross-motions on April 29, 1983 and May 9, 1983 respectively, alleging that the doctrine of *res judicata* barred the plaintiffs' action entirely. In the alternative, the two defendants alleged that they were entitled to summary judgment on the issue of ownership. Since there were many material facts still in dispute, the Court, on May 30, 1984, by order denied the cross-motions.

Thereafter, on July 18, 1984, the defendant filed a second motion for summary judgment again alleging the bar of *res judicata* and, in the alternative, that it should prevail on the issue of ownership. In their responses, the plaintiffs reiterated by cross-motion that they were the rightful owners of the property and should be so adjudged.

In its second motion for summary judgment, the Government argued basically two points. First, the Government argued that the plaintiffs were bound under the doctrine of *res judicata* by the district court judgment awarding compensation to the State of Idaho for the taking of Tract 1202 since plaintiffs had both actual and constructive notice of the taking but failed to intervene in the proceeding to condemn

Tract 1202. Second, it argued on the merits of the ownership issue that the 1945 deed to Tract 1201 only speaks to 3.28 acres and not to some six acres that would be owned if the acreage of Tracts 1201 and 1202 were combined. It was the Government's view that the parties to the original deed of conveyance (Cox Estate to Sanford) intended to convey only 3.28 acres and that the meander line westerly boundary call of Tract 1201 was meant to be a fixed boundary rather than an elastic boundary that would extend to the ordinary high water line of the Snake River. Thus, the Government asserted that the plaintiffs were not the owners of Tract 1202, the three acres to the west of Tract 1201 which had a meander line boundary.

In their reply and cross-motion, the plaintiffs argued that the Government never did comply with Rule 71A and the Fifth Amendment to the United States Constitution in regard to giving them adequate notice of the imminent condemnation action as to Tract 1202 and thus they were not subject to the doctrine of *res judicata* in this inverse condemnation action in this Court. Moreover, the plaintiffs' allege fee ownership of Tract 1202 on the grounds that all of the parties to the various deeds starting with the Cox Estate to Mrs. N.C. Sanford on down to them intended that ownership would run to and abut the ordinary high water line of the east bank of the Snake River. The plaintiffs contend that the term "meander line" used in the successive deeds of conveyance for Tract 1201 was used to describe the sinuosities of the Snake River. The true western boundary line of their land was not a fixed boundary but the term was used in the deeds to represent the ordinary high water mark of the river (and thus inclusive of the land designated as Tract 1202). This being the case, the money was paid in error to the State of Idaho instead of to themselves as the legitimate fee owners of Tract 1202.

In *Houser v. United States*, 9 Cl.Ct. 35 (1985), this Court denied the parties' motions for summary judgment and held that *res judicata* did not bar the action in this Court. *Res judicata* was inapplicable for two reasons. First, the Government was aware of the plaintiffs' interest in Tract 1202 by the notice provided in Schedule B of its own Second Preliminary Title Certificate, in addition to other indications of interest. Thus, because the plaintiffs were not unknown owners, the Government was under an affirmative duty to notify the plaintiffs of the district court, Tract 1202, condemnation proceedings. *See* Rule 71A(c)(2). Second, the plaintiffs did not have *adequate* notice of the district court action, notwithstanding that they had either actual or constructive notice that Tract 1202 *might* be condemned at some *unknown future time*. Therefore, sufficient grounds to invoke *res judicata* and bar plaintiffs' action did not exist. The cross-motions for summary judgment on the issue of ownership also were denied because material facts were still in dispute, and, therefore, summary judgment as a matter of law was inappropriate.

The dispute was then set for trial, which, as already indicated, was conducted in the Federal Courthouse facilities in Moscow, Idaho, on April 18–20, 1986.

It is undisputed that a taking of Tract 1202 within the meaning of the Fifth Amendment occurred. What is at issue here is whether the plaintiffs, as they contend, or the State of Idaho, as the defendants contend, were the true owners of the parcel of land known as Tract 1202 at the time of the taking in 1972.

The resolution of the pivotal ownership issue in this case turns on this Court's factual and legal determinations in regard to the intentions of the conveying parties in conveying what is now known as Tract 1201 beginning with the Cox Estate deed of conveyance to Mrs. N.C. Sanford in 1899, and continuing through to the deed from Mr. Guy Richards to the Housers in 1945. Critical to the ultimate resolution of this dispute is how this Court reads the intentions of the parties in using the term "meander line" as the western boundary call in the various deeds of conveyances used with regard to this property. Also of importance will be this Court's factual determinations in regard to the matters of the accretion of land along the navigable Snake

River and the recent use in possession of the land at issue.

The parties presented eight witnesses and numerous documents to aid the Court in its determinations as to both liability and damage/valuation issues.

The plaintiffs' lead witness was Mr. William Larson, who is the son of Mrs. Frances Houser Larson Hampton, one of the two plaintiffs named in this action.[2] He described himself as a farmer, rancher, and real estate subdivider. It was his grandfather, Mr. W.J. Houser, and grandmother, Mrs. Emma Houser, who purchased Tract 1201 from Mr. Richards in 1945. Mr. Larson described how, as a teen age boy, his grandfather employed him as a laborer at the Houser's cement block plant located on the property. Mr. Larson described, how on several occasions, he would be walking on the property (both Tracts 1201 and 1202) with his grandfather, who would indicate that he had purchased the land from the road (Snake River Avenue) all the way to the river. Snake River Avenue was then, and still is, a major thoroughfare in the City of Lewiston.

As evidence of his grandfather's use of the entire property, Mr. Larson explained that Mr. Houser had purchased the land in 1945 with the express purpose of locating a cement block factory on it. Mr. Houser thought the location was ideal in view of the available sand and gravel as well as the access to the growing Lewiston area. Mr. Houser started his cement block plant immediately after purchasing the property and he operated it for approximately 2½ years. Thereafter, he sold it to a purchaser who moved the operation to Alaska. During the time the cement block plant was operating, Mr. W.J. Houser would transport pumice by truck from a railroad spur line that ended just north of the north boundary of Tract 1202. This spur line was located on land which was owned by the Lewiston Grain Growers Cooperative. His trucks would take the pumice from the

railroad cars and drive southeast across the northeast section of Tract 1202 to deliver the pumice at the plant which was located on the 1201 Tract. Mr. Larson testified that his grandfather had considered extending the railroad spur onto his property (Tract 1202), but that he never did so because the block plant operation was sold in 1948.

Mr. Larson also testified that shortly after the Houser cement plant was sold, the Housers' property was leased to the Lewiston Pre-Mix Company. The leasing arrangement was continued with minor interruptions until the land was condemned by the Government in 1972/1973. Mr. Larson also noted that approximately two-thirds of Tract 1202 was used for commercial purposes by the Housers (or their lessees) from 1945 until 1973. As additional evidence of this use in possession, Mr. Larson relied on an aerial photograph taken by the Government in 1973 which shows the Lewiston Pre-Mix Company conveyor, concrete silo and concrete slab located on Tract 1202 and the drying kilns, business office and plant situated on Tract 1201. A portion of Tract 1202 also was used by Lewiston Pre-Mix Company for equipment storage and as a truck washing area. It is clear from the Court's review of that Government aerial photograph of Tracts 1201 and 1202, taken on February 21, 1973, that the Lewiston Pre-Mix Company was making extensive use of at least the eastern half of Tract 1202 in its business operations otherwise being conducted on Tract 1201.

Mr. Larson averred that no one else from 1945 to 1973, other than plaintiffs or their lessees, ever used any portion of Tracts 1201 or 1202 with the limited exception of an electric power company. The Washington Water Power Company placed a large power pole on Tract 1202, pursuant to an easement negotiated with Mrs. Emma Houser. The easement negotiated ran along the northern portion of Tract 1202. This right-of-way easement was duly recorded in the Recorder's Office of Nez

---

**2.** The other person named as a party plaintiff in this action is Mrs. Emma Houser. Mrs. Emma Houser died on April 24, 1980. Her sole heir at law was her daughter, Mrs. Frances Houser Larson Hampton. Plaintiffs have not, however, filed any motions to remove Mrs. Emma Houser as a plaintiff in this action.

Perce County, Idaho, on January 31, 1964. It is clear from this transaction that the utility company in 1964 determined that the Housers owned Tract 1202 (as opposed to the State of Idaho).

Mr. Larson also testified that the Lewiston Grain Growers, owners of land abutting the subject property to the north, and all of the owners of property located south of Tracts 1201 and 1202 were paid to the ordinary high water mark when their land was taken by the Government. Tracts 1303, 1304, 1308 and 1308-2, located immediately south of the property in question and which are a part of the University Addition plat, were all platted lots measuring 52 by 144 feet, comprising one-sixth of an acre, yet the Government paid the owners to the ordinary high water line of the Snake River. These land owners were paid for significantly more land than their platted lots contained. As an example, the owner of Tract 1303, located immediately to the south of Tract 1201/1202, was paid for 1.49 acres rather than the one-sixth of an acre that was shown on the plat.

Mr. Larson also discussed the accretion of land on Tract 1202. Mr. Larson stated that the physical appearance of Tract 1202 had changed since 1945. He claimed that Tract 1202 was built up over time. This was possible, he said, because the velocity of the water on the west side of the river is greater than that on the east. Thus, build up of river deposits on the east side of the river occurred and the land accreted. He also indicated that Tract 1202 flooded about one year in five to 725 feet mean sea level. This would mean that approximately one-half of Tract 1202 would be under water during the flooding. Also he testified that when the river receded, sand and other deposits would be left behind which caused the accretion of the land on Tract 1202.

The plaintiffs' second witness was Mr. Gerald Willett. Mr. Willett was a professor of engineering at the University of Idaho in Moscow, who taught land surveying and related civil engineering courses. He is a registered civil engineer, land surveyor and consultant. The plaintiff offered Mr. Willett as an expert in land surveying and the nomenclature of surveying. Mr. Willett reviewed the various deeds of conveyances involved in this case together with the initial Government surveys and the various plats, and concluded that the plaintiffs owned Tract 1202 at issue in this case. His review of all of the above mentioned documents convinced him that the parties to the original deed from the Cox Estate to Mrs. Sanford and all subsequent parties thereafter had intended to convey all of the land contained in the deed description (Tract 1201) down to the ordinary high water mark of the Snake River. The meander line call which formed the western boundary of all of the various deed descriptions of Tract 1201 was intended to be an elastic boundary connoting the ordinary high water mark of the east bank of the Snake River. He came to this conclusion because of his knowledge of the land survey techniques being used in the late 1800's in the United States and the law that had developed based on those techniques. He stated that the original Government land surveys used meander lines as a surveying technique to determine the appropriate acreage in those cases where the land abutted natural monuments such as navigable rivers, lakes, etc. The meander line in a Government survey was used because it was virtually impossible to survey the actual ordinary high water mark along a river. Thus, the term was used in surveys and plats to represent an approximation of the ordinary high water mark along a navigable river. Therefore, when the term began to be picked up by lawyers and others and used in deeds of conveyances, the same meanings attached to the meander line call placed in surveys and plats by land surveyors were intended to be applied as to the deeds. In fact, Mr. Willett testified that the Supreme Court of the United States in the case of *Railroad Co. v. Schurmeir*, 74 U.S. (7 Wall.) 272 (1869), and the Supreme Court of Idaho in *Johnson v. Hurst*, 10 Idaho 308, 77 P. 784 (1904), have both found that when a meander line call is in a deed of conveyance, the general rule is that the parties to the land conveyance intended the meander line boundary to be an elastic boundary connoting ownership to the ordi-

nary high water mark of a navigable river. The meander line call in the deed will not be the true or fixed boundary line, but the grantee will take title of the land to the ordinary high water line of the river. Based on the above discussed reasons, and after reviewing all of the deeds, surveys, and plats at issue, it was Mr. Willett's opinion that the plaintiffs owned all of the land from the western border of Tract 1201 to the ordinary high water mark on the east side of the Snake River, *i.e.*, owned all of Tract 1202.

The plaintiffs' third witness was Mr. E.V. Ponack. Mr. Ponack was an attorney and a long time title insurance company official. He was the manager of the North Idaho Title Insurance Company in Lewiston from 1965 to 1968, worked with the Lane County Title Insurance Company in Eugene, Oregon, from 1968 to 1971, and then returned to the Lewiston, Idaho area as owner and manager of the Nez Perce County Title Company and Soton County Title Company from 1971 to 1982, when he sold the title companies. Since then, he has done consulting work for individuals and for title insurance companies. The plaintiffs called Mr. Ponack as an expert witness to testify on the matter of land titles in general and specifically as to the ownership of the land at issue in this case.

Mr. Ponack testified that he had examined the Abstract of Title (# A3830) for the property at issue in this case, he was familiar with the description of the Tracts 1201 and 1202 and of the surrounding tracts, he was familiar with the various plats and surveys on file with the County Recorder's Office, and he had examined the various deeds of conveyances, starting with the Cox Estate deed to Mrs. N.C. Sanford in 1899. From a review of all of this documentary evidence, it was his opinion that the Housers owned both Tracts 1201 and 1202. He indicated that this was the case because the language used in the deeds evidenced an intention to convey from the Cox Estate to Mrs. Sanford (and to all subsequent grantees) all of the land from the meander line boundary to the ordinary high water mark of the river. Furthermore, he was of the opinion that the State

of Idaho did not own Tract 1202 since there was no possible way that they could have become the owners of the property, unless by deed of conveyance which would have been duly recorded, had it happened. Mr. Ponack explained that when a meander line call is used in a deed of conveyance as a boundary line, it is used to connote the ordinary high water mark of the abutting river. This is the general rule of law that is followed in the State of Idaho when examining titles to land.

When asked on cross-examination as to why the North Idaho Title Insurance Company in 1971 and 1972 listed the State of Idaho as the fee owners of Tract 1202 and the Housers as only having an "interest" in the property, Mr. Ponack responded that he did not know why it was set up that way, but that he certainly thought it was a departure from the general rule. Had he been the manager of the title company at the time, he would not have set up the title in the State of Idaho, and he may not have even mentioned any "interest" by the State of Idaho in the property in the Schedule B exceptions.

Having considered all the above described documentary evidence, Mr. Ponack was of the strong opinion that the Housers owned Tract 1202.

The plaintiffs' fourth witness was Mr. Roland G. Hoefer, a real estate appraiser. The plaintiffs offered Mr. Hoefer primarily as their expert as to damages (just compensation). Mr. Hoefer had a distinguished educational and experience background having appraised properties for an array of clients on a full-time basis since 1950. He had been familiar with the Snake River/Lewiston area for some twenty years. Mr. Hoefer submitted a written appraisal report to the Court as well as testifying at the trial.

The Lewiston Pre-Mix Company had used Mr. Hoefer's services in the Tract 1201 condemnation action in the 1973–1976 time frame so Mr. Hoefer was intimately familiar with both Tracts 1201 and 1202 from that experience. At the time that he was preparing his appraisal report for the

Tract 1201 condemnation, he had reviewed many surveys, plats and other documents available in the City Engineer's Office in Lewiston as well as the County Recorder's Office. From these documents, and from his inspection of the land itself, he had concluded that the 1202 Tract was land gained by accretion. In his view, the Snake River in the 1890's was much closer to the meander line indicated in the deeds at issue in this case than at the time of the taking in 1972. His accretion theory was also buttressed by a review of several plats on file in the County Recorder's Office which depicted the banks of the Snake River at the westerly boundary of Tract 1201, the westerly boundary of the Cox Addition to the City of Lewiston plat, and the westerly boundary of the University Addition plat.

From all of this documentary review, Mr. Hoefer concluded that the Housers did in fact own Tract 1202 as land gained by accretion, and because that land was contiguous to the western boundary of Tract 1201. Also, he could find no indication that the State of Idaho had ever gained title to Tract 1202.

Thus convinced that the Housers owned the property, Mr. Hoefer proceeded to appraise Tract 1202 as if it was under one ownership of some six acres rather than as if it was owned separately from Tract 1201. One contiguous property would have considerably more economic value since there would be no access problems to Snake River Avenue from Tract 1202. Based on the comparable sales approach, in which he compared sales of other recently sold parcels of industrial property in and around Lewiston, Mr. Hoefer concluded that the 3.12 acres taken by the Government on December 18, 1982, if filled and leveled, had a fair market value of $1 per square foot or $135,000. The fair market value of the land in its "as is" condition was determined to be $.75 per square foot or $102,-000. This Court found Mr. Hoefer's report and testimony to be very credible evidence as to the value of Tract 1202.

The plaintiffs' final witness was Mr. Wayne Van Zante. Mr. Van Zante was a rebuttal witness who was used by the plaintiffs to establish that Tract 1202 could be filled with dirt available on Tract 1201, and that the fill and the labor cost for the work would amount to approximately $6,000.

The defendant's first witness was Ms. Virginia M. Adams. Ms. Adams is the chief deputy assessor for Nez Perce County. Her office receives title information from the County Recorder's Office in order to assess taxes in Nez Perce County. She testified that the Housers were never assessed, nor did they pay taxes for Tract 1202. Also, she stated that her records indicated that the State of Idaho was the owner of Tract 1202. However, when asked which records from the Recorder's Office provided the information as to how the state gained title to the land, she said that she "ha[d] no idea." She also did not discuss whether the owners of the platted lots to the south of Tracts 1201 and 1202 had paid taxes for the land that was located between the western border of their lots and the river bank, and for which they were paid by the Government in the those condemnation actions.

The defendant's second witness was Mr. Allen Baim. Mr. Baim, who is now retired, was a former chief of the real estate division at the Walla Walla District of the United States Army Corps of Engineers, and was directly involved in the acquisition and condemnation of properties along the Snake River for the Lower Granite Lock and Dam Project.

Mr. Baim first described to the Court the procedures used by the Corps when title searches were ordered for properties to be acquired for the Lower Granite Lock and Dam Project. He testified that preliminary certificates of title, with a $1,000 limitation of liability, were obtained from several of the title insurance companies in the area, including the North Idaho Title Company, for properties located within the project boundaries. A Preliminary Title Certificate for the parcel of land later designated by the Corps as Tract 1201 was received in June 1965. Title was shown as vested in fee in Emma Houser and Frances Houser

Larson. Schedule A of this title certificate contained the same legal description of the property that is at issue in the instant case with the exception that the acreage was not described. As earlier indicated, Schedule B of the certificate included two exceptions of note, those being for any claim arising from the difference in the mean high water line of the Snake River and the meander line as shown by the Government survey, and a utility easement for a power pole.

Mr. Baim also stated that Tract 1202 "came about because when tract 1201 was placed on the [Corps'] segment drawing [of the area to be condemned], there was a very large area between the westerly boundary of tract 1201 and the ordinary high water line." This tract of land was then designated by the Corps as Tract 1202 and, in December 1971, a Preliminary Title Certificate was requested for the tract. This certificate, dated December 28, 1971, stated that title was vested in the State of Idaho. Again, Schedule B of the certificate contained two exceptions of note, those being for parties in possession, and any claims arising from the difference in the mean high water line of the Snake River and the meander line as shown by Government survey.

In view of these exceptions, the Corps inquired by letter dated May 16, 1972, of the title company as to what these exceptions meant as to the title to Tract 1202. Thereafter, on June 8, 1972, the title company furnished their Second Preliminary Title Certificate to the Corps pertaining to Tract 1202. This second certificate clearly contained an exception on its Schedule B which stated an exception for the "[r]ight, title and interest of Emma Houser and Frances Houser Larson by virtue of the fact that this land is an extension to the west of their property on the East [Tract 1201] and could be determined to be land gained by accretion." Mr. Baim acknowledged to the Court that this exception raised a "cloud" on the State of Idaho's title to Tract 1202.

As noted earlier, the plaintiffs never received notice of the Tract 1202 condemnation proceedings brought in the district court on December 18, 1972, notwithstanding the Schedule B exception contained in the Second Preliminary Title Certificate. Mr. Baim explained that it was apparently an "oversight" on the part of the Government. He said it was the responsibility of the U.S. Attorney's office in the State of Idaho to accomplish the appropriate personal service and notice. He did state that normally the Government *does* notice in any parties showing an interest in the real estate to be condemned in a district court condemnation action. This, of course, is what Rule 71A of the Federal Rules of Civil Procedure requires.

Mr. Baim then proceeded to plot, on a City of Lewiston Engineer's Office map of the vicinity,[3] the legal descriptions contained in the Cox administrator's original Notice of Sale and that contained in the Return of Sale and deed issued to Mrs. Sanford in 1899.

The western boundary of the parcel originally offered for sale was drawn at the east bank of the Snake River as shown on the Engineer's Office map and was approximately 924 feet long. The northern boundary was approximately 450 feet across, and the eastern and southern boundaries were approximately 900 feet long and 400 feet wide, respectively. This parcel contained approximately six acres.

Mr. Baim then attempted to explain the reason for the discrepancy in acreage between the land originally offered for sale by the administrator of Cox's Estate and that land actually purchased by Mrs. Sanford. He was of the opinion that, in 1899, only a portion of the six-acre tract was available for sale by the Cox Estate. The northern half of the six-acre tract offered for sale was described on the engineer's plat as the Cox Addition and was divided into two blocks which were further subdivided into ten lots each. By tracing the chain of title for each lot, he determined that all of the lots in Blocks 1 and 2 were conveyed prior to the death of Mr. Cox,

3. Defendant's Exhibit No. 17.

thus, they were not available for sale by his estate. As a result of his research, Mr. Baim concluded that the original description of the property offered for sale in the Notice of Sale was in error and was corrected in the Return of Sale document and in the deed of conveyance prepared by the administrator of Cox's Estate and issued to Mrs. Sanford in 1899. Mr. Baim's opinion as to what occurred to create the discrepancy between what was initially offered for sale and what actually was sold in 1899 was consistent with what Mr. Ponack (the plaintiff's expert title witness) had stated had likely occurred. Mr. Ponack, although he did not plot the legal description for the Court, had also stated that only a portion of the original six-acre tract offered for sale was actually sold to Mrs. Sanford in 1899.

The eastern border of Tract 1201 was the same as that of the original parcel offered for sale except that it was 333 feet rather than 900 feet long. The northern boundary was drawn approximately 40 feet below what was the southern boundary of Blocks 1 and 2, the area between the two boundaries being a street dedicated by Mr. Houser. This northern boundary was approximately 423 feet wide, thus, the northwest corner did not extend completely to the river bank or western border of the original parcel. On the other hand, the southern boundary of Tract 1201, which was the same as the original southern border, extended 65 feet beyond the river bank or what was depicted as the western boundary of the original parcel.

At the completion of Mr. Baim's reconciliation exercise, it was clear to the Court that the land offered for sale by the administrator was comprised of Blocks 1 and 2 in the northern half of the six acres, *and* the Sanford property, which was the southern half of the parcel.

Mr. Baim then proceeded to analyze why the Engineer's Office map he was using showed the Snake River to be at the westerly boundary of Tract 1201, and the westerly boundary of the numbered lots contained in Block 1 of Cox's Addition. He explained this inconvenient circumstance by stating that the map must have been drawn or photographed during a flood of the Snake River. Although the Engineer's Office map was undated except for a revision date of May 1961, it is clear that the map was originally drawn many years before May 1961. In any event, he presented to the Court certain aerial photographs taken in 1970 during a flood that depicted the Snake River at about the location as the Snake River was shown on the Engineer's Office map. He did admit to the Court, however, that the Corps never draws maps at flood stage, but only draws plats and maps showing a river at the ordinary high water mark. Although Mr. Baim's flood stage theory was interesting, it was not persuasive, and the Court concludes that the Engineer's Office map showed the Snake River at the ordinary high water mark. This being the case, it is clear that at some point between 1899 and 1945, the ordinary high water line of the Snake River was located approximately at the western boundary of Tract 1201, and it gives serious credence to the theory that Tract 1202 was land gained by accretion.

Mr. Baim also concluded that the meander line terminology, used to describe Tract 1201's western border, was intended by the parties to indicate a fixed boundary of the land. He was of the opinion that the administrator of Cox's Estate intended to convey a particular parcel of land of a particular number of acres. He based this conclusion solely on the fact that the Return of Sale document and the deed issued to Mrs. Sanford, described the parcel of land in metes and bounds and included the fact that the land contained 3.28 acres. Thus, he was of the opinion that title to Tract 1202 did not rest with the Housers but, rather, was vested in the State of Idaho. He could not, however, explain *how* the State of Idaho gained title to the land.

Mr. Baim also had trouble explaining to the Court why the Corps gave different treatment to all the landowners to the immediate north and south of Tracts 1201 and 1202. All of these landowners were paid for the land from their western boundaries down to the ordinary high water line of the

Snake River. Only the Housers were not so treated.

Mr. Baim testified that the treatment was different because the other transactions were negotiated purchases in which the owners made quit claim grants of the land to the ordinary high water line to the Government. He also noted that there were "indications" that the other landowners were paying taxes to the ordinary high water line. These "indications" referred to, however, were never explained nor substantiated. Mr. Baim finally concluded that the plaintiffs were treated differently from the other landowners because their property was described in the deeds as being within certain metes and bounds and containing a given acreage.

As to the potential for accretion, Mr. Baim testified that he had known the river since he had lived in the Lewiston/Clarkson area as a boy and he did not believe that the river did or could change that much over the course of some 45 years. Even here, however, Mr. Baim contradicted himself by stating that the river's beach, where he used to swim, would change every year. Sometimes the beach would be extremely wide and other times the beach would be very narrow. Although Mr. Baim strove mightily to demolish the accretion theory, the sum of his total testimony adds support to the theory that the river did in fact flood and change course so that land in time accreted to the property at issue.

The defendant's third and final witness was a Mr. Ross Mellor. Mr. Mellor was a real estate appraiser, broker and investor. Mr. Mellor has been employed as a real estate appraiser since 1955, and has been involved in appraisal work in the Lewiston, Idaho, area since 1963. He was assigned by the Government to appraise Tract 1201 in 1971, and also appraised several properties south of Tract 1202. Mr. Mellor also testified as an expert witness, on behalf of the Government, in the Tract 1201 condemnation proceeding that occurred in 1976.

Like Mr. Hoefer, Mr. Mellor also used the comparable sales approach in arriving at his estimate of fair market value, but viewed Tract 1202 as a separate parcel for purposes of valuation and comparison. This position resulted in a lower "as is" value due to the cost needed to create improved access to the land. Also, Mr. Mellor approximated the cost to level and fill the property (including riprap along the bank) at $72,000 as opposed to the plaintiffs' estimate of approximately $34,000. Mr. Mellor concluded that the tract, if filled and leveled, had a fair market value of $.90 per square foot. The value of the parcel in its "as is" condition, however, was determined to be $.43 per square foot or $50,085.

Although Mr. Mellor was a credible witness, the Court noted his tendency to increase the costs to use the land beyond what the evidence indicated was necessary.

*Discussion*

A. Liability/Ownership Issue

1. Ownership gained by deed of conveyance.

█ It is an established general rule of law that the term "meander line" when used as a boundary call in a deed of conveyance to land which abuts a navigable river, conveys that land to the grantee to the ordinary high water line of the river. Under the general rule, the "meander line" call does not become a fixed boundary of a conveyed parcel of land.

█ The term "meander line" arose as a land surveying term. It was used by land surveyors as a technique to approximate the amount of acreage contained within a given parcel of land. This technique was used in the late 19th and early 20th centuries because, given the technology of the time, a computation of the actual acreage of a parcel of land with an irregular border, such as land abutting a navigable river, was difficult if not impossible to accomplish. The meander line located on a land survey plat would be used to approximate the sinuosity, or bends and curves, of the ordinary high water line of a navigable river. Fixed monuments would be set, in the property being surveyed, at the changes in the water course. The meander line would then be depicted on a plat as a straight line connecting these fixed points.

Thus, because the actual, irregular boundary of the land was depicted as a straight line, the acreage computation was greatly simplified. However, the ordinary high water line, rather than the meander line, would remain the true boundary of the parcel of land. Grantees who were purchasing land abutting a navigable river would purchase not to the actual "meander line" but would purchase the land to the ordinary high water line of the river that the "meander line" was meant to represent. This became a legal presumption as to the intent of the parties in purchasing land that abutted a navigable river.

This general rule was first recognized by the United States Supreme Court in *Railroad Co. v. Schurmeir*, 74 U.S. (7 Wall) 272 (1869). In *Schurmeir*, the Supreme Court stated:

> Meander-lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.

*Railroad Co. v. Schurmeir*, 74 U.S. at 286–87.

The Idaho Supreme Court in *Johnson v. Hurst*, 10 Idaho 308, 318–19, 77 P. 784, 788 (1904) also held:

> It is conceded as the general rule of law that the meander line run in surveying public lands bordering upon a navigable river is not a line of boundary, but one designed merely to point out the sinuosity of the bank of the stream, and as a means only of ascertaining the quantity of land in the fraction that is to be paid for by the purchaser, and that the water course, and not the meander line as actually run on the land, becomes the true boundary line.

*See also Scott v. Lattig*, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490 (1913); *Heckman Ranches, Inc. v. State*, 99 Idaho 793, 589 P.2d 540 (1979); *Smith v. Long*, 76 Idaho 265, 281 P.2d 483 (1955); *Younie v. Sheek*, 44 Idaho 767, 260 P. 419 (1927); *Stroup v. Matthews*, 44 Idaho 134, 255 P. 406 (1927).

The plaintiffs, of course, have relied on this general rule of law in support of their position that they owned all of the land west of Tract 1201's western boundary to the ordinary high water line of the Snake River. The western boundary was described as a "meander line" in the sequence of deeds that ultimately granted them Tract 1201 in fee.

The defendant has argued strenuously throughout this proceeding that the general interpretation of the term "meander line" is inapplicable in the present case. In support of its position, the defendant relies on what it considers to be an exception to the meander line general rule. This exception provides that the meander line will constitute a fixed boundary if such is proven to be the clear intention of the conveying parties. *Heckman Ranches v. State*, *supra*, 99 Idaho at 796, 589 P.2d at 543.

The Government and the State of Idaho have attempted to establish this intent by arguing that the general rule applies only when the term is used by the *Government* in *its* surveys of public lands bordering a navigable river. Because the term was used only in a legal description within a sale between private parties, the defendant argues that the general rule does not apply and, therefore, the meander line constitutes a fixed boundary. Additionally, the Government claims that the use of a metes and bounds description and a reference to the acreage to be conveyed in the various deeds of conveyances establishes the parties' intent to define the meander line as a fixed boundary.

Unfortunately for the Government, however, its arguments are not supported by the evidence adduced at trial. The first argument, that the rule is inapplicable because the term "meander line" was used only in the various conveyances (sales) between private parties, is incorrect, both factually and as a legal proposition. *See Railroad Co. v. Schurmeir, supra*, and *Johnson v. Hurst, supra*.

It is undisputed in this case that the original land survey run by the United

States Government on the land at issue here, in the late 1800's, used the "meander line" surveying technique. From that initial Government survey, the meander line boundary found its way onto virtually every map and plat made of the land at issue. For instance, the Government meander line is placed on all the maps, plats and drawings contained in the original abstract of title introduced into evidence in this case, for the land at issue. Also, the meander line appears on many of the County of Nez Perce's and City of Lewiston's maps and plats of the area, also admitted into evidence. Specifically, the City of Lewiston's Engineer's Office map, which Mr. Baim used to plot the legal description described in the administrator's Notice of Sale documents as well as that described in the Sanford deed, contained the infamous "Government meander line." Thus, the Government's assertion that the term "meander line" was dreamed up and used only between private parties is contradicted by its own exhibits. The general rule, that a meander line represents the sinuosity of the river rather than a fixed boundary, therefore, is applicable unless the defendant can show by credible evidence that a contrary intent existed. This Court finds that no such credible evidence has been presented.

Plaintiffs, however, presented extensive evidence supporting their legal position that the "meander line" call used in the deeds was merely representative of the intention of the parties to convey the land in question to the ordinary high water line of the east bank of the Snake River. First, the plaintiffs presented two very credible expert witnesses who were disinterested in the outcome of this action. Mr. Ponack was a real estate title expert and attorney who had spent some 25 years reviewing land title matters. It was his unqualified opinion that the Housers owned this land and that the State of Idaho did not own it. It was his view that the title insurance company that had shown title in the State of Idaho had made a mistake. The second expert witness, Mr. Willett, was an expert in land surveying. In fact, he taught the course in land surveying at the University

of Idaho, School of Engineering. Mr. Willett also was of the unqualified opinion that, based on the rules and nomenclature of land surveying and in view of the law that had developed surrounding that practice, the Housers owned this property.

Second, the plaintiffs presented a member of the Houser family, Mr. Larson, to testify as to what he knew of the matter. Although clearly interested in the outcome of this matter, he presented very credible testimony. Mr. Larson proceeded to tell the Court about how and why his grandfather had purchased the land and what use he had made of it. Clearly, Mr. Houser thought he had purchased land to the river because he, and after his death, his family, used the entire parcel of land for business purposes. The aerial photographs confirm the business use of both Tracts 1201 and 1202 by the Housers and their lessees. Additionally, an electric utility company purchased a right-of-way easement on Tract 1202 in 1964 on which to place a large power pole. Had the Housers not owned that tract at that point, clearly the electric company would have given its money for the easement to someone else, who could give them a valid and legal easement. Mr. Larson's story held together and made sense. He clearly showed that the Housers were exhibiting control and dominion over both Tracts 1201 and 1202. This use in possession as attested to by Mr. Larson, was further strong indicia of ownership. This was in sharp contrast to the fact that the State of Idaho never showed *any* indicia of ownership during the time frame at issue.

Third, the many documents introduced by both parties further support the plaintiffs' position in this dispute. The abstract of title clearly shows the western boundary of the original 88.5 acres sold to Mr. Cox in 1882 as abutting the east bank of the Snake River. Also, the legal description of the six-acre tract of land originally offered for sale by the Cox Estate described the tract's western border as the "east bank of the Snake River." The reconciliation exercise performed by Mr. Baim (which was very helpful to the Court), provided to this

Court the information that what was actually purchased by Mrs. Sanford in 1899 was the southern half of this six-acre tract. The Engineer's Office map used by Mr. Baim also shows that, for all intents and purposes, the western boundary of the property sold to Mrs. Sanford (Tract 1201) was the same as the western border of the six-acre tract originally offered for sale by the administrator. This Engineer's Office map shows the Snake River at approximately the western border of Tract 1201. Although Mr. Baim opined that the map had been drawn showing the Snake River at flood stage, the Court finds otherwise, *i.e.*, that the map was drawn with the Snake River depicted at the ordinary high water line. The original abstract of title prepared in 1906 also shows the northern and southern sides of the Sanford conveyance as measured in feet, with the western boundaries of each side ending in a point marked as a "post in stone." The western side of the conveyance, labeled a "meander line," connects these two "posts in stone." Most significantly, however, this meander line, as drawn, directly abuts the Snake River; also the river's name is written in immediately above the labeled meander line. The aforementioned exhibits are pivotal evidence in support of the plaintiffs' ownership claim.

It is clear from these documents, and for that matter from all of the other evidence presented in this case, that what Mrs. Sanford bought in 1899 was a parcel of land of approximately 3.28 acres that in 1899 abutted the ordinary high water line of the east bank of the Snake River. Each successive grantee purchased that same parcel of land as extended by accretion, until the Housers purchased the property in 1945. The western border of Tract 1201, represented in the successive deeds of conveyances by a "meander line" merely represented that the ultimate purchaser would continue to own the property to the ordinary high water line. The "meander line" boundary call was used in all of the deeds consistent with the general rule of law applicable to navigable river cases.

Finally, failure by the Corps of Engineers to apply the general rule when a deed of conveyance uses a boundary call to a "meander line" is the very factor which gave birth to this long-standing dispute. As early as June 28, 1965, the Corps obtained a Preliminary Title Certificate for Tract 1201, which described the western boundary of the Houser property as a "meander line." The Corps, however, did not construe the term "meander line" as being an approximation of the sinuosities of the Snake River. As a result, Tract 1202 "came about." Mr. Baim testified that when Tract 1201 was placed on the segment drawing, there was a large area between the western boundary of Tract 1201 and the ordinary high water line as depicted on the Corps' segment drawing. A description was then prepared by the Corps and the parcel of land was designated as Tract 1202.

The "large area" should have been included as a part of Tract 1201, because, as owners of property with a meander line western border, the Housers owned all the land to the high water line of the Snake River. If Tract 1201's legal description had been properly interpreted by the Corps, it never would have designated the 3 acres to the west of 1201 as Tract 1202, and the plaintiffs would have been compensated for the area now known as Tract 1202 when the Government condemned Tract 1201. This treatment of the Housers' property would, of course, have been consistent with the treatment offered to all of the other riparian landowners and neighbors to the south and to the north of their property.

2. Tract 1202 was land gained by accretion.

▮ The issue of whether Tract 1202 is actually land created by accretion was raised at a very late point in this case. An examination of earlier submissions by both parties reveals that until the date of trial, all parties to this law suit were following the mistaken assumption that the six-acre tract, originally offered for sale by the Cox Estate, was comprised of Tract 1201 and, to its immediate west, Tract 1202. This assumption was based upon the fact that,

coincidentally, the combined acreage of Tracts 1201 and 1202 was approximately six acres.

This assumed set of facts was proven faulty at trial, however, based upon the reconciliation exercise performed by Mr. Baim, and confirmed by Mr. Ponack. Mr. Baim plotted the legal description of the original six-acre parcel of property on the Engineer's Office map of the City of Lewiston. This proved that the six-acre tract description contained in the Notice of Sale documents included Blocks 1 and 2 of Cox's Addition and the 3.28 acre tract of land known as Tract 1201. Blocks 1 and 2 of the Cox Addition approximated three acres in size and were located immediately to the north of Tract 1201.

Apparently, the discrepancy between the original six-acre description described in the Notice of Sale and the 3.28 acre description of the tract ultimately conveyed to Mrs. Sanford by deed resulted from the mistaken inclusion of Blocks 1 and 2 of Cox's Addition into the former; land which Mr. Cox had in fact already sold during his lifetime. The reconciliation exercise performed by Mr. Baim in Court not only resolved the mystery of the discrepancy between the two legal descriptions but, also, supported the plaintiffs' contention that Tract 1202 was land gained by accretion. Accretion, of course, is the gradual build up of land created by a river's action.

What is now known as Tract 1202, did not appear anywhere on the Engineer's Office map, upon which defendant's witness plotted the legal descriptions, because the western border of Tract 1201, as drawn by the defendant's expert witness, abutted the eastern bank of the Snake River. Mr. Baim tried to explain this by concluding that the river line drawn on the Engineer's Office map was the "flood line" and not the ordinary high water line. Thus, Tract 1202 existed but was under water. He then pointed to a 1970 photograph of a flood along the Snake River, to show that the level of the river roughly corresponded to the river line on the Engineer's Office map. As earlier indicated, this Court believes

that Mr. Baim's conclusion was erroneous. First, Mr. Baim admitted that the Corps *never* draws maps at flood stage and that plats, other than those prepared by the Corps, are *not* ordinarily drawn showing the flood line. Second, both the legal description of the six-acre tract, which used the phrase "east bank of Snake River" to describe its western border, and the Engineer's Office map are devoid of *any* indication that flood stage was used or intended to be used.

Also, the original drawing accompanying the 1890 Cox Addition dedication was examined by Mr. Gerald E. Willett, one of the plaintiffs' expert witnesses. Mr. Willett testified that his examination of the drawing showed the river "right along side the Cox Addition showing the river being at the meander line." This Court also having examined the drawing finds that since Tract 1201 was situated immediately south of Blocks 1 and 2 of the Cox Addition and had a contiguous western border, it is logical to conclude that Tract 1201, as of 1890, abutted the Snake River as well.

This conclusion is further supported by the diagram appearing on page 33½ of the original Abstract of Title.[4] This diagram shows the land, purchased by Mrs. Sanford, Tract 1201, having as its westernmost border a meander line with the label "Snake River" written immediately above the label "meander line." From these documents, the conclusion is obvious that the property conveyed to Mrs. Sanford was intended to have the Snake River as its western border. In addition, since the property known as Tract 1201 is now situated inland, the only reasonable explanation for the existence of Tract 1202 is that it is land gained by accretion.

The additional evidence which led to this Court's inference that Tract 1202 is land gained by accretion included the testimony of Mr. William Larson, the son of plaintiff Frances Houser Larson Hampton. He testified that the east bank of the Snake River was fairly slow in velocity so that in high water periods, sand would settle out along

---

4. Joint Party Exhibit No. 8.

the bank, causing a buildup of the land. Mr. Baim's testimony in part also supported the accretion theory.

In addition, the Second Preliminary Certificate of Title also lends support to the plaintiff's accretion theory because Schedule B listed an exception for the "[r]ight, title and interest of Emma Houser and Frances Houser Larson by virtue of the fact that this land is an extension to the west of their property on the East and *could be determined to be land gained by accretion.*" (Emphasis supplied.) Finally, the letter dated June 14, 1972, and issued to the Corps of Engineers from the North Idaho Title Company, states that "[t]his land [Tract 1202] is the former river bed of the Snake River and is now above the mean high water line of said River and therefore *land created by accreation* [sic] *or avulsion.*" (Emphasis supplied.)

Based on the above discussion, this Court finds that Tract 1202 did *not* exist in the late 19th century and it is, therefore, land created by accretion. Because the plaintiffs' ownership extends to the ordinary high water line, this Court holds that fee ownership of Tract 1202 is vested in the plaintiffs.

The Court finds that plaintiffs have proven that title to Tract 1202 was in fact vested in them at the date of the taking in 1972. Also, the Court finds that defendant's or the third-party defendant's failure to provide *any* evidence as to how the State of Idaho obtained title to Tract 1202 only strengthens the plaintiffs' case.

## B. Just Compensation/Valuation

■ The Fifth Amendment to the United States Constitution provides that private property may not be taken for public use without just compensation. The Supreme Court has determined that the term "just compensation" means the full monetary equivalent of the property taken. *Almota Farmers Elevator & Whse. Co. v. United States*, 409 U.S. 470, 473, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973). The owner of property taken by the sovereign is entitled to be put in the same position, from a monetary standpoint, as if there had been no taking.

*Almota Farmers Elevator & Whse. Co., supra,* 409 U.S. at 473–74, 93 S.Ct. at 794–95; *see also Foster v. United States,* 2 Cl.Ct. 426, 445 (1983).

■ The process of awarding just compensation cannot be reduced to a mere formula, *United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949), nor can it be limited to inexorable rules. *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949); *see also United States v. 3969.59 Acres of Land,* 56 F.Supp. 831, 838 (D.Idaho 1944). In determining an award of just compensation, the court must consider notions of fairness and equity. *See United States v. Fuller,* 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973); *Foster v. United States, supra,* 2 Cl.Ct. at 446.

The fair market value of the property at the time of a taking has become the accepted criterion for determining just compensation due the property owner. *United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 279–80, 87 L.Ed. 336, *reh'g denied,* 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162 (1943); *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708–09, 78 L.Ed. 1236 (1934); *Foster v. United States, supra,* 2 Cl.Ct. at 445. The term "fair market value" has been defined to be the amount a willing buyer would agree to pay a willing seller in cash, with neither party being under a compulsion to buy or sell and with both being fully informed about all relevant matters relating to the circumstances surrounding the transaction. *See United States v. Miller, supra,* 317 U.S. at 374, 63 S.Ct. at 280; *Georgia-Pacific Corp. v. United States,* 226 Ct.Cl. 95, 105, 640 F.2d 328, 335 (1980).

■ The comparable sales approach, used by both the plaintiffs and the defendant in the present case, analyzes sales of similar commercial property in order to arrive at a fair market value for the property being appraised. It is generally accepted that this approach provides the best evidence of fair market value. *See United*

*States v. 179.26 Acres of Land,* 644 F.2d 367, 371 (10th Cir.1981).

▮ To begin with, both valuation experts used the comparable sales method in order to arrive at a value for Tract 1202 as if the low parts of the property were filled and leveled. Mr. Hoefer, plaintiffs' expert, valued the tract as if it were a part of Tract 1201 rather than as a separate and distinct parcel of land. Based on this assumption, he concluded that the fair market value of the 3.12 acres taken by the Government was $1 per square foot or $135,907. Mr. Mellor, defendant's expert, made his valuation and comparison relying on the mistaken assumption that Tract 1202 was a separate parcel of property, therefore, needing improved access because it did not abut Snake River Avenue. Based on this assumption, he determined the filled and leveled value of the taken land to be $.90 per square foot or $121,500.

Because it is now clear that the plaintiffs are the owners of the land (Tract 1202) that was taken as well as the contiguous Tract 1201, the Court concludes that Mr. Hoefer's determination of fair market value at $1 per square foot for Tract 1202, if filled and leveled, is the correct one.

From this value of $1 per square foot, must be subtracted the cost necessary to fill and level the land so that the "as is" value of Tract 1202, as of December 18, 1972, can be determined. Mr. Hoefer arrived at a cost-to-fill figure of $34,208 or approximately $.25 per square foot. This figure is the same cost-to-fill figure as was used in the original 1972 Tract 1202 district court condemnation proceedings. Defendant's appraiser, on the other hand, arrived at a cost-to-fill figure of some $72,000. Once again, the Court finds that Mr. Hoefer's estimation of this cost-to-fill figure is the correct one.

Mr. Mellor's cost figure is excessive for three primary reasons. First, he based his estimate on the assumption that the *entire* 3.12 acre tract of land would need to be filled and leveled in order to make it commercially usable. This opinion was at variance with the opinion of Mr. Hoefer, and that of the appraiser in the earlier district

court action, both of whom stated that the elevation of only the western one-third of the property abutting the river needed to be raised. Second, Mr. Mellor included $25,625 for the cost of riprap in his appraisal; whereas plaintiffs' expert did not. To supplement the plaintiffs' position, Mr. William Larson was recalled to the stand. He testified that riprap was not, in fact, needed. He noted that the eastern side of the river flowed slowly, therefore, there was no wave action which could erode Tract 1202 and necessitate the use of riprap. To buttress his assertion, Mr. Larson testified that no riprap had been used when Lewiston Grain Growers completed fill work on their land located directly north of Tract 1202. The Court agrees with this assessment that no riprap was needed. Third, Mr. Mellor included a cost amount of $6,625 for paving an access road to Tract 1202. This cost was clearly unnecessary given that Tract 1202, and 1201 were, in fact, one contiguous parcel of land.

Mr. Hoefer subtracted the $.25 per square foot cost-to-fill figure from the $1 per square foot filled figure which yielded a $.75 per square foot "as is" figure. Multiplying $.75 per square foot by 135,907 square feet computes to a fair market value of $101,930.25 rounded to $102,000. The Court determines that Mr. Hoefer's analysis of the fair market value of Tract 1202 was the correct one. Thus, after careful consideration of all of the evidence presented, this Court finds that the 3.12 acres taken by the Government had an "as is" fair market value of $.75 per square foot or $102,000 as of December 18, 1972. Plaintiffs, therefore, are entitled to recover this amount.

### C. Interest on Award

▮ It is long established that the award of just compensation to the owner of property which is taken pursuant to the Fifth Amendment includes an amount for interest computed from the date of the taking to the date of payment by the defendant. *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 588, 67 S.Ct. 398, 399–400, 91 L.Ed. 521 (1947); *Miller v. United*

*States,* 223 Ct.Cl. 352, 399, 620 F.2d 812, 837 (1980); *Cloverport Sand & Gravel Co. v. United States,* 6 Cl.Ct. 178 (1984).

The United States Court of Claims adopted a rate of 7.5 percent for the period 1971 through 1975 and a rate of 8.5 percent for the period 1976 through 1979. *Miller, supra,* 223 Ct.Cl. at 406, 620 F.2d at 841. So that a uniform method of establishing interest rates would exist for periods beginning on or after January 1, 1980, the interest rates established under the method provided for in the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.,* will be applied. *Accord Hedstrom Lumber Co. v. United States,* 7 Cl.Ct. 16, 33–34 (1984); *Foster v. United States,* 3 Cl.Ct. 738 (1983). These rates are established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41, 85 Stat. 97, and are deemed appropriate for the computation of just compensation, in the present case, for the period commencing after January 1, 1980. Simple interest from the date of the taking, December 18, 1972 through December 31, 1975, will be computed at an annual rate of 7.5 percent. Interest for the period January 1, 1976 through December 31, 1979, will be computed at an annual rate of 8.5 percent. Finally, for the period from January 1, 1980 to the date of payment, interest shall be computed using the method established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41, 85 Stat. 97.

### D. Judgment Against Third-Party Defendant

Third-party practice in the United States Claims Court is governed by 41 U.S.C. § 114(b) (1982). This statute reads in pertinent part:

> The United States Claims Court, on motion of either of the parties, or on its own motion, may summon any and all persons with legal capacity to be sued to appear as a party or parties in any suit or proceeding of any nature whatsoever pending in said court to assert and defend their interests, if any, in such suits or proceedings, * * *. * * * The United States Claims Court may, upon motion of the Attorney General, in any suit or proceeding where there may be any number

of persons having possible interests therein, notify such persons to appear to assert and defend such interests. * * * [E]xcept that the United States shall not be heard upon any counterclaims, claims for damages or other demands whatsoever against such person, *other than claims and contingent claims for the recovery of money hereafter paid by the United States in respect of the transaction or matter which constitutes the subject matter of such case,* unless and until such person shall assert therein a claim, or an interest in a claim, against the United States * * *. [Emphasis supplied.]

The United States Court of Claims interpreted this statute in *Bowser, Inc. v. United States and General Steel Tank Co.,* 190 Ct.Cl. 441, 420 F.2d 1057 (1970). *See also Petrovick v. United States,* 190 Ct.Cl. 760, 421 F.2d 1364 (1970). The court in *Bowser* stated that the provisions of the statute are applicable when "the Government is sued in the principal action for money which it had in its hands at one time but which it has disbursed to the third party under a mistake of fact or law. If the court decides the Government should have paid the money to plaintiff instead of to the third party, the Government is then entitled to judgment on its contingent claim against the third party." *Bowser, supra,* 190 Ct.Cl. at 449, 420 F.2d at 1062–63.

 Because this Court has determined that the plaintiffs were the rightful owners of Tract 1202, it is axiomatic that the State of Idaho was not the rightful owner and that the payment of $34,320 awarded to the State of Idaho was erroneous. As a result, judgment in favor of the United States and against the State of Idaho will be entered in the amount of $34,320.

 Finally, defendant is not entitled to receive interest on the amount erroneously paid to the third-party defendant because "money paid or received by mistake does not draw interest until after discovery of the mistake." *Sykes v. United States,* 392 F.2d 735, 739 n. 2 (8th Cir.1968). *See also United States v. 3,317.39 Acres,* 481 F.2d 417 (8th Cir.1973). Furthermore, it would

be inequitable to charge the State of Idaho interest in a matter where it was the affirmative duty of the United States Government to determine in an appropriate proceeding who was the owner of the property involved. The United States Government, of course, breached that affirmative duty, in the first instance.

### E. Attorneys' Fees and Expenses

■ Plaintiffs also seek an award of attorneys' fees and expenses pursuant to the Uniform Relocation Act, 42 U.S.C. § 4654(c) (1982).

This provision reads:

The court rendering a judgment for the plaintiff in a proceeding brought under section * * * 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, * * * shall determine and award or allow to such plaintiff, as a part of such judgment * *, such sum as will in the opinion of the court * * * reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c) (1982).

Because plaintiffs instituted this action pursuant to 28 U.S.C. § 1491 (1982) and this Court has determined that they are entitled to an award of just compensation for the taking of their property, Tract 1202, by the United States, they are, therefore, also entitled to recover their reasonable attorneys' fees and expenses incurred because of these proceedings.

To the extent that the plaintiffs wish to continue their pursuit of attorneys' fees and expenses, they shall file an application for their litigation fees and expenses not later than 30 days from the date of this opinion. The plaintiffs' application shall be supported with itemized documents detailing the man-hours devoted to this case, standard hourly billing rates of all individuals who worked on the case, any amounts paid to experts and any other expenses for which reimbursement is claimed.[5] The defendant shall file its response within 30 days of the filing date of the plaintiffs' application. The plaintiffs' reply to the defendant's response shall be filed not later than 14 days after the date of filing of the defendant's response.

### CONCLUSION

Plaintiffs are the owners of Tract 1202 at issue in this inverse condemnation case and are entitled to $102,000 plus interest as just compensation for the taking of Tract 1202 on December 18, 1972. The plaintiffs are entitled to receive simple interest on that amount at a rate of 7.5 percent per annum from December 18, 1972 through December 31, 1975 and at a rate of 8.5 percent per annum from January 1, 1976 through December 31, 1979. For the period from January 1, 1980 until the date of payment by the Government, interest shall be calculated in accordance with the method established by the Secretary of the Treasury in Pub.L. No. 92–41. The plaintiffs' application for attorneys' fees and expenses will be considered after all supporting documents have been filed with the Court. Upon a determination of the plaintiffs' attorneys' fees and expenses, judgment will be entered as provided above.

At the same time as the judgment against the United States of America is entered by the Court, judgment will also be entered against the State of Idaho in the amount of $34,320, and in favor of the United States of America on its contingent claim, since the State of Idaho, having mistakenly received this amount from the United States of America as the alleged owner of Tract 1202, is not entitled to retain the same.

---

5. The Court is aware that the plaintiffs, on June 23, 1986, filed a premature Motion for Allowance of Costs, citing 28 U.S.C. § 2412(d)(1)(A) and 40 U.S.C. § 258a. Since the plaintiffs are now aware of the appropriate authority under which they may maintain their request for attorneys' fees and expenses, the Court will disregard the earlier filed motion, and will entertain a newly filed motion for attorneys' fees and expenses, to the extent that the plaintiffs choose to do so.